Filed 7/9/24  P. v. Benitez CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ANGEL GUTIERREZ-BENITEZ,<br><br>    Defendant and Appellant. | B325345<br><br>(Los Angeles County<br> Super. Ct. No. NA116883) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Laura Laesecke, Judge.  Affirmed.

Robert L. Hernandez, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Noah P. Hill, Supervising Deputy Attorney General, Nima Razfar, Deputy Attorney General, for Plaintiff and Respondent.

_____

Angel Gutierrez-Benitez appeals from a judgment of conviction entered after a jury found him guilty of assault with a deadly weapon and the attempted murder of Gregorio Renteria. Gutierrez-Benitez contends on appeal the trial court erred in denying his request to instruct the jury on self-defense and the lesser-included offense of attempted voluntary manslaughter based on imperfect self-defense. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A.    *Evidence at Trial*

Shortly before 2:00 a.m. on April 13, 2021, six friends gathered on the Pine Avenue Pier in Long Beach. The group consisted of four men, Renteria, William Velez, Brian Macias, and Andy Mendoza, and two women, Natalie Valdez and Melanie Esquivel. Velez, Macias, Valdez, and Esquivel sat on benches lining one side of the pier (in male/female pairs), and Renteria stood a short distance away further down the pier. Mendoza had rented an electric scooter, which he was riding up and down the pier past his friends. No one in the group had a weapon.

About 10 to 15 minutes after the group arrived at the pier, Gutierrez-Benitez walked down the pier in the group's direction. Gutierrez-Benitez, whom the group did not know, wore a dark hooded sweatshirt with a red, white, and blue logo on the front, with the hood over his head. He walked past the benches where Velez, Macias, Valdez, and Esquivel were seated without making eye contact with them.[1]

---

[1]    Surveillance video of the Pine Avenue Pier recorded at the time of the incident was played for the jury, and Renteria and

After Gutierrez-Benitez walked to the far end of the benches, he turned around and engaged Mendoza, who then stopped his scooter. According to Renteria's and Velez's trial testimony, Gutierrez-Benitez asked Mendoza, "Do you guys have a problem?" to which Mendoza responded, "No. Do you have a problem?"[2] Gutierrez-Benitez next asked Mendoza, "Do you bang?," to which Mendoza responded, "Yes, I bang, I'm from Compton T Flats. Where you from homie?" Gutierrez-Benitez answered, "Yes, we do have a problem," and he balled his hands into fists as if he wanted to fight. Mendoza raised his fists in a defensive position.

Renteria testified he was "kind of shadowing" Mendoza at the time, and he was about two to three feet away during the initial exchange between Mendoza and Gutierrez-Benitez. Renteria told Gutierrez-Benitez, "Hey, man. Nobody has a problem," and he stepped between Mendoza and Gutierrez-Benitez to try to deescalate the situation. Gutierrez-Benitez then pulled a knife from his sweatshirt pocket, lunged at Renteria, and stabbed Renteria in the chest with a hammering motion.

Renteria immediately fled from Gutierrez-Benitez (walking backwards toward the entrance to the pier), and his friends

Velez testified as to the events that are depicted. However, due to the low light, poor image resolution, and distance from the events, it is difficult to distinguish particular individuals based solely on the video.

[2]     Esquivel testified that Gutierrez-Benitez's first words when he approached Mendoza and Renteria were, "Where are you from?" She stated that in her experience, "Where are you from?" is a phrase used when "you're trying to start something. You're either trying to fight or rob [someone]."

3

quickly followed. Gutierrez-Benitez paused for a moment, then walked in the same direction to leave the pier. Gutierrez-Benitez continued walking behind some restaurants in a retail area on the shoreline. Macias called 911 and followed Gutierrez-Benitez, while the other members of the group tended to Renteria.[3]

Long Beach Police officers responded to a call for a stabbing incident shortly after 2:00 a.m. Officers detained Gutierrez-Benitez after a brief pursuit and located a folding knife with a three-and-a-half inch, spear-shaped, fine-point blade with dried blood on it in nearby bushes.[4] Paramedics treated Renteria for a penetrating chest wound and stabilized him for transport to the hospital. Although Renteria survived, the stabbing punctured his lung, requiring multiple surgeries.

Renteria, Macias, Velez, Esquivel, and Valdez testified about the assault, with minor variations in their testimony. Renteria testified Gutierrez-Benitez approached only him and

---

[3] Velez testified that after the stabbing, he (and unspecified others) followed Gutierrez-Benitez, and at one point Gutierrez-Benitez turned around, walked toward them, and "was trying to lunge at us because we were getting close." The surveillance video from the Pine Avenue Pier showed the six friends leave the pier, followed by Gutierrez-Benitez, but it did not capture any subsequent engagement between Velez and Gutierrez-Benitez.

[4] Macias identified Gutierrez-Benitez at a field show-up after Gutierrez-Benitez was detained on April 13. Macias and the other members of the group who testified at trial identified Gutierrez-Benitez in the courtroom. The field show-up form, which was admitted at trial, stated Gutierrez-Benitez was 5 feet 7 inches tall and weighed 150 pounds. Renteria testified Mendoza was about 5 feet 9 inches tall and weighed about 160 pounds with a "stocky" build.

4

Mendoza, whereas Macias testified Gutierrez-Benitez approached the entire group. Velez testified he thought Gutierrez-Benitez was just a "dude" who "was struggling," or someone who seemed "shady a little bit," and Esquivel testified she thought Gutierrez-Benitez was a homeless person. Valdez testified that Gutierrez-Benitez stared at everyone when he approached them. Mendoza did not testify.[5]

B.      *Request for Self-defense Jury Instructions*

After the People rested their case, Gutierrez-Benitez's attorney renewed a request that the trial court instruct the jury on self-defense theories.[6] The attorney argued that Mendoza's statement to Gutierrez-Benitez that he was a member of the Compton T [Tortilla] Flats gang amounted to "fighting words." Also, "the way [the group] spread out, it seemed like they were— from the video—lining up in an attacking position and that warrants self-defense."

The trial court disagreed, emphasizing that Gutierrez-Benitez went up to one or more members of the group and was the first to speak words to the effect of "Where are you from? Do we have a problem?" Moreover, "even if the witnesses are spread out or the victims are spread out, there isn't any substantial evidence . . . or at least some evidence that [Gutierrez-Benitez] was in . . . fear . . . [w]hether reasonable or unreasonable." The court added, "I also don't see any lesser included offenses. . . . It's

---

[5]      Gutierrez-Benitez did not testify in his own defense or call any witnesses.

[6]      The record on appeal does not include or identify the specific self-defense jury instructions defense counsel requested.

either attempted murder or it's not.  There [are] no voluntary manslaughter issues here."  Defense counsel submitted, and the court denied "any request for self-defense instructions."

C.    *Closing Arguments*

During closing arguments, Gutierrez-Benitez's attorney pointed out that the People did not call Mendoza as a witness, and there was no accurate account of the night's events without Mendoza's testimony.  The attorney argued it was a "reasonable interpretation of the evidence" in light of  Mendoza's larger build and his expressing his gang membership that "at that moment . . . [Gutierrez-Benitez] now thinks that everybody, all four of those guys, are from the Flats[.]  Wouldn't that change the situation dramatically?  ¶  . . .  ¶  And then when you see [Mendoza and Renteria] separate, combined with the thought that, hey, these dudes are from the Flats, [Gutierrez-Benitez] took care of the situation.  He disarmed one person.  He saw that [Mendoza] wasn't going to do anything and then he walked away. He didn't run.  Okay.  He walked away."  These circumstances negated a finding that Gutierrez-Benitez had the specific intent to kill Renteria.

In his final closing argument, the prosecutor admonished the jury not to consider self-defense:  "If anyone goes back there and starts talking about self-defense or something like that, there is none.  There was no evidence of it.  The judge did not instruct you on it.  ¶  . . .  ¶  This is not a self-defense case, and you are not to consider it."  The prosecutor focused on the fact Gutierrez-Benitez first approached and challenged Mendoza and Renteria, and he argued that Gutierrez-Benitez's "meaningful stab" to Renteria's chest, which caused severe injuries that required

6

numerous surgeries, showed that Gutierrez-Benitez had the specific intent to kill.

D.    *Jury Verdict and Sentencing*

The jury found Gutierrez-Benitez guilty of assault with a deadly weapon on Renteria (Pen. Code, § 245, subd. (a)(1);[7] count 1) and attempted murder of Renteria (§§ 187, subd. (a), 664; count 3).[8]  As to each count, the jury found true the special allegation Gutierrez-Benitez personally inflicted great bodily injury on Renteria (§ 12022.7, subd. (a)).

In a bifurcated court proceeding, Gutierrez-Benitez admitted he suffered a prior conviction for robbery (§ 211) that qualified as a serious or violent felony under the three strikes law (§§ 667, subds. (b)-(i), 1170.12).  Gutierrez-Benitez also admitted the aggravating factors that he suffered a prior conviction for assault by means of force likely to cause great bodily injury (§ 245, subd. (a)(4)) and was on probation in two cases at the time of the instant assault.

The trial court sentenced Gutierrez-Benitez to 21 years in state prison on count 3 for attempted murder, comprising the upper term of nine years, doubled under the three strikes law, plus three years for the great bodily injury enhancement.  On count 1 for assault with a deadly weapon, the court imposed and stayed under section 654 an eight-year sentence, comprising the middle term of four years, doubled under the three strikes law.

Gutierrez-Benitez timely appealed.

---

[7]    Further statutory references are to the Penal Code.

[8]    The jury found Gutierrez-Benitez not guilty of assault on Mendoza and Velez (count 2).

7

**DISCUSSION**

A.      *Governing Law and Standard of Review*

With respect to homicide, "[s]elf-defense, when based on a *reasonable* belief that killing is necessary to avert an imminent threat of death or great bodily injury, is a complete justification, and such a killing is not a crime." (*People v. Elmore* (2014) 59 Cal.4th 121, 133-134; see § 197, subds. (1) & (2) [homicide is justifiable "[w]hen resisting any attempt to murder any person, or to commit a felony, or to do some great bodily injury upon any person" and "[w]hen committed in defense of habitation, property, or person, against one who manifestly intends or endeavors, by violence or surprise, to commit a felony"]; see also CALCRIM No. 505.) "For killing to be in self-defense, the defendant must actually and reasonably believe in the need to defend." (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1082 (*Humphrey*); accord, *People v. Horn* (2021) 63 Cal.App.5th 672, 682; *People v. Rodarte* (2014) 223 Cal.App.4th 1158, 1168 ["Perfect self-defense requires that a defendant have an honest and reasonable belief in the need to defend himself or herself."].)

Self-defense is also a defense to assault. "[T]he difference between self-defense in the homicide context and self-defense that will justify an assault . . . lies in the type of the threat the defendant believed they faced. To justify a homicide or attempted homicide, the defendant must believe that 'danger [of death]' or 'great bodily [injury]' is imminent, whereas an assault committed in self-defense may be justified if the defendant feared that any 'bodily injury,' or even an 'unlawful touching,' was imminent. For both homicide and assault, the amount of force the defendant uses must be no more than reasonably necessary to

8

fend off the perceived threat." (*People v. Waxlax* (2021) 72 Cal.App.5th 579, 591-592; see CALCRIM No. 3470 [enumerating elements of right to self-defense for non-homicide crimes].)

A murder charge may also be mitigated by imperfect self-defense.[9] "If the belief [in the need to defend oneself] subjectively exists but is objectively unreasonable, there is 'imperfect self-defense,' i.e., 'the defendant is deemed to have acted without malice and cannot be convicted of murder,' but can be convicted of manslaughter." (*Humphrey, supra*, 13 Cal.4th at p. 1082; accord, *People v. Horn, supra*, 63 Cal.App.5th at p. 682; see *People v. Booker* (2011) 51 Cal.4th 141, 182 ["Imperfect self-defense is the killing of another human being under the actual but unreasonable belief that the killer was in imminent danger of death or great bodily injury."]; CALCRIM No. 604 [listing elements of imperfect self-defense for attempted voluntary manslaughter].) Thus, imperfect or "[u]nreasonable self-defense is 'not a true defense; rather, it is a shorthand description of one form of voluntary manslaughter.'" (*People v. Elmore, supra*, 59 Cal.4th at p. 134; accord, *People v. Barton* (1995) 12 Cal.4th 186, 200; see *In re Christian S.* (1994) 7 Cal.4th 768, 773 ["'[a]n *honest* but *unreasonable* belief that it is necessary to defend oneself from imminent peril to life or great bodily injury negates malice aforethought, the mental element necessary for murder, so that the chargeable offense is reduced to manslaughter.'"].)

---

[9] Because assault is a general intent crime, there is no defense of imperfect self-defense. (See *People v. Minifie* (1996) 13 Cal.4th 1055, 1069 ["this case involves an assault, not a homicide, and thus no question of *imperfect* self-defense is presented"].)

The principles governing perfect and imperfect self-defense "also apply to self-defense in the context of *attempted* murder and *attempted* voluntary manslaughter." (*Horn*, at p. 682.)

"[S]elf-defense . . . whether perfect or imperfect, require[s] an actual fear of *imminent* harm." (*People v. Butler* (2009) 46 Cal.4th 847, 868; accord, *People v. Rodarte, supra*, 223 Cal.App.4th at p. 1168 ["'The defendant's fear must be of *imminent* danger to life or great bodily injury.'"].) "'Fear of future harm—no matter how great the fear and no matter how great the likelihood of the harm—will not suffice. . . . '"[T]he peril must appear to the defendant as immediate and present and not prospective or even in the near future. An imminent peril is one that, from appearances, must be instantly dealt with.'"'" (*People v. Manriquez* (2005) 37 Cal.4th 547, 581 (*Manriquez*), italics omitted.) "All of the surrounding circumstances, including prior assaults and threats, may be considered in determining whether the accused perceived an imminent threat of death or great bodily injury." (*People v. Battle* (2011) 198 Cal.App.4th 50, 72; see *Humphrey, supra*, 13 Cal.4th at p. 1083 ["Although the ultimate test of reasonableness is objective, in determining whether a reasonable person in defendant's position would have believed in the need to defend, the jury must consider all of the relevant circumstances in which defendant found herself."].)

Self-defense and imperfect self-defense are not available defenses to a defendant who is the initial aggressor. The Supreme Court has "explained that 'the ordinary self-defense doctrine—applicable when a defendant *reasonably* believes that his safety is endangered—may not be invoked by a defendant who, through his own wrongful conduct (e.g., the initiation of a physical attack or the commission of a felony), has created

10

circumstances under which his adversary's attack or pursuit is legally justified.'" (*People v. Valencia* (2008) 43 Cal.4th 268, 288; accord, *People v. Enraca* (2012) 53 Cal.4th 735, 761.)[10]

As a general matter, "'[a] trial court must give a requested [jury] instruction only if it is supported by substantial evidence, that is, evidence sufficient to deserve jury consideration.'" (*People v. Leon* (2020) 8 Cal.5th 831, 848; accord, *People v. Nguyen* (2015) 61 Cal.4th 1015, 1049 ["'Just as with perfect self-defense or any defense, "[a] trial court need give a requested instruction concerning a defense *only if there is substantial evidence to support the defense*."'"]; *People v. Larsen* (2012) 205 Cal.App.4th 810, 823 ["'[A] trial judge' . . . 'has the authority to refuse requested instructions on a defense theory for which there is no supporting evidence.'"].)[11] "'"[B]efore a jury can be

_____

[10]  CALCRIM No. 3471 ("Right to Self-Defense:  Mutual Combat or Initial Aggressor") provides in relevant part that a person who engages in mutual combat or who starts a fight has a right to self-defense only if:  1.  "(He/She) actually and in good faith tried to stop fighting;" and 2.  "(He/She) indicated, by word or conduct, to (his/her) opponent, in a way that a reasonable person would understand, that (he/she) wanted to stop fighting and that (he/she) had stopped fighting."  Because we conclude there was insufficient evidence Gutierrez-Benitez was in actual fear of imminent harm, we do not reach whether the initial aggressor limitation on self-defense applied.

[11]  Even absent a request, a trial court must sua sponte instruct on self-defense when "it appears that the defendant was relying on the defense, or that there was substantial evidence supportive of the defense, and the defense was not inconsistent with the defendant's theory of the case." (*Manriquez, supra,* 37 Cal.4th at p. 581.)  The court must instruct on imperfect self-

11

instructed that it may draw a particular inference, evidence must appear in the record which, if believed by the jury, will support the suggested inference.""" (*People v. Alexander* (2010) 49 Cal.4th 846, 920-921; accord, *Larsen*, at p. 823 ["Substantial evidence in this context "'is 'evidence sufficient "to deserve consideration by the jury," not "whenever *any* evidence is presented, no matter how weak."""""].)[12]  Conversely, an instruction is not required where only "[s]peculative, minimal, or insubstantial evidence" supports the instruction.  (*People v. Simon* (2016) 1 Cal.5th 98, 132, 134 (*Simon*).)  "In determining whether the evidence is sufficient to warrant a jury instruction, the trial court does not determine the credibility of the defense evidence, but only whether 'there was evidence which, if believed by the jury, was sufficient to raise a reasonable doubt.'"  (*People v. Salas* (2006) 37 Cal.4th 967, 982-983; *Larsen*, at pp. 823-824.)  In deciding

_____

defense "whenever there is evidence substantial enough to merit consideration by the jury that under this doctrine the defendant is guilty of voluntary manslaughter."  (*Ibid.*)

[12]    The same evidentiary standard applies to instruction on a lesser included offense (here, attempted voluntary manslaughter):  With respect to a lesser included offense, "'[T]he existence of "*any* evidence, no matter how weak" will not justify instruction on a lesser included offense, but such instructions are required whenever evidence that the defendant is guilty only of the lesser offense is "substantial enough to merit consideration" by the jury.'"  (*People v. Moye* (2009) 47 Cal.4th 537, 553; accord, *People v. Banks* (2023) 97 Cal.App.5th 376, 387.)  ""'[S]peculation is an insufficient basis upon which to require the giving of an instruction on a lesser included offense.""'"  (*People v. Valdez* (2004) 32 Cal.4th 73, 116; accord, *People v. Williams* (2015) 61 Cal.4th 1244, 1264.)

12

whether to give a defense instruction, the court must "view the evidence in the light most favorable to the defendant." (*People v. Millbrook* (2014) 222 Cal.App.4th 1122, 1137.)

When a defendant's request for a jury instruction has been refused, we review the record de novo to determine whether there was substantial evidence that required giving the instruction. (*Simon, supra*, 1 Cal.5th at p. 133 ["We review de novo a trial court's decision not to give an imperfect self-defense instruction."]; *People v. Avila* (2009) 46 Cal.4th 680, 705 ["On appeal, we review independently the question whether the trial court failed to instruct on a lesser included offense."]; see *People v. Cole* (2004) 33 Cal.4th 1158, 1217 ["'Whether or not to give any particular instruction in any particular case entails the resolution of a mixed question of law and fact [and] . . . should be examined without deference.'"].)

B.      *The Trial Court Did Not Err in Refusing Gutierrez-Benitez's Request for Self-defense Jury Instructions*

On appeal, Gutierrez-Benitez contends the trial court erred in refusing to instruct the jury on self-defense and attempted voluntary manslaughter (i.e., imperfect self-defense) because there was evidence from which the jury could have found Gutierrez-Benitez "feared for his safety and felt the need to defend himself." Contrary to his contention, the record is devoid of any evidence Gutierrez-Benitez was in actual fear of harm, whether reasonable or unreasonable.

As discussed, five witnesses provided a materially uncontroverted account of the events on the early morning of April 13, 2021, consistent with the surveillance video. Four of the six friends were seated on benches on the pier, Mendoza was

13

riding his scooter back and forth along the pier, and Renteria was standing a short distance from the seated friends. No one said anything to or otherwise engaged Gutierrez-Benitez before Gutierrez-Benitez turned and confronted Mendoza midway down the pier. It was Gutierrez-Benitez who asked Mendoza whether they "have a problem" or (according to Esquival), "Where are you from?" When Mendoza responded that they did not have a problem, Gutierrez-Benitez persisted, asking "[d]o you bang?" After Mendoza answered that he was a Compton Tortilla Flats gang member, it was Gutierrez-Benitez who proclaimed they did "have a problem" and balled up his fists. Mendoza then raised his fists in a "defensive position." Renteria attempted to deescalate the situation by moving between the men and telling Gutierrez-Benitez they did not have a problem, to which Gutierrez-Benitez pulled out a knife with a three-and-a-half inch pointed blade and stabbed Renteria in the chest with a hammering motion. It was Renteria who fled toward the entrance of the pier, followed by his friends. Gutierrez-Benitez did not show any sign of fear, instead pausing and following in the direction of the six friends.

Gutierrez-Benitez does not identify any evidence that during this encounter he was in actual fear of imminent harm (*People v. Butler, supra*, 46 Cal.4th 847 at p. 868) or that he "actually and reasonably believe[d] in the need to defend." (*Humphrey, supra*, 13 Cal.4th at p. 1082.) There was no witness testimony indicating Gutierrez-Benitez expressed or acted out of fear, let alone fear of imminent harm. (See *People v. Hill* (2005) 131 Cal.App.4th 1089, 1102 ["While it is true that substantial evidence of a defendant's state of mind may be found in the testimony of witnesses other than a defendant [citation], no other

14

witness in the instant case testified that defendant acted out of reasonable fear. . . . The most complete version of defendant's conduct . . . came from the testimony of [defendant's girlfriend], which was totally devoid of any expression of fear by defendant."], disapproved on another ground in *People v. French* (2008) 43 Cal.4th 36, 48, fn. 5; see also *Manriquez, supra*, 37 Cal.4th at pp. 581-582 [evidence was "clearly" insufficient to give imperfect self-defense instruction where the defendant, who shot a man who came to his motel to argue about a mutual girlfriend, told officers '"he had heard some threats"' the victim wanted to kill him, but he "never indicated [to police] he felt he was under any imminent threat" of great bodily injury, and the witness testimony "contained nothing to indicate defendant feared the victim"].) The only descriptions of Gutierrez-Benitez were Velez's observation that he appeared a little "shady" and Esquivel's suggestion Gutierrez-Benitez looked like a homeless person. The witnesses did not express any hostility towards Gutierrez-Benitez, and as Velez explained, they were taken by surprise when he stabbed Renteria.

Gutierrez-Benitez relies on the fact he was outnumbered, noting that four of the six members of the group were men. But being outnumbered, without more, does not show evidence of actual and reasonable fear—it would be pure speculation to infer Gutierrez-Benitez was fearful simply from the fact he stabbed Renteria in the presence of five other people on the pier, especially given that four of them were seated on benches on the side of the pier. (See *Simon, supra*, 1 Cal.5th at pp. 132-134 [speculative evidence is insufficient to support instruction]; *People v. Valdez* (2004) 32 Cal.4th 73, 116 [same].) Moreover, although we must view the record in the light most favorable to

15

the defendant, Gutierrez-Benitez's characterization of what happened is contrary to the record. He argues the video shows him walking "towards a group of six people on the pier," but as noted, there was no "group" of people—the video shows two male-female pairs seated on benches to the side and two men somewhat further down the pier. The video reflects Gutierrez-Benitez engaging initially only with Mendoza, and then with Renteria. Gutierrez-Benitez also argues that he might have believed he was under attack given that Mendoza drove past him on a motorized scooter and circled back to him and then Renteria approached him. But the surveillance video shows Mendoza repeatedly riding up and down the pier, simply turning around to continue his ride given the pier's narrow projection into the harbor. And Mendoza was riding the scooter back and forth for more than two minutes before Gutierrez-Benitez walked onto the pier. Gutierrez-Benitez ascribes a hostility to Mendoza's actions in riding the scooter that is not evident from the video.

Gutierrez-Benitez also contends that although the evidence suggested he was the aggressor in his exchange with Mendoza and Renteria in asking whether they "have a problem" and banged, he could have made this inquiry "out of concern for his safety and not in order to engage the group in a fight," and further, he could have been in fear as a result of Mendoza's response that Mendoza was a gang member. And, Gutierrez-Benitez argues, "the jury could also have interpreted [Mendoza's] response [that he was in a gang] as escalating the confrontation or as confirming [Gutierrez-Benitez's] suspicion that he was in danger."

Gutierrez-Mendoza's argument relies entirely on speculation that he was initially concerned for his safety when he

challenged Mendoza and Renteria, and further, that after inquiring into whether Mendoza was a gang member, the answer that he was in a gang placed Gutierrez-Benitez in fear of imminent harm.  And it was Gutierrez-Benitez who escalated the exchange to incipient violence when he stated that they did have a problem and balled his hands into fists, especially given that when Mendoza responded by raising his fists, Renteria interceded to keep the peace, telling Gutierrez-Benitez that "[n]obody has a problem."  It was at that point that Gutierrez-Benitez resorted to deadly violence by producing a knife and stabbing Renteria.

**DISPOSITION**

The judgment is affirmed.


FEUER, J.

We concur:



SEGAL, Acting P. J.



STONE, J.


17