Filed 6/18/21  P. v. Labeaud CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>RONALD PATRICK LABEAUD,<br><br>Defendant and Appellant. | B305310<br><br>Los Angeles County<br>Super. Ct. No. VA151453 |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mildred Escobedo, Judge.  Affirmed.

Pensanti & Associates and Louisa Pensanti for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven D. Matthews and Rama R. Maline, Deputy Attorneys General, for Plaintiff and Respondent.

———————————

A jury convicted Ronald Patrick Labeaud of assault with a deadly weapon causing great bodily injury, and Labeaud admitted to three prior felony convictions. The court sentenced him to 25 years to life plus three years. Labeaud appeals, and we affirm.

## BACKGROUND

An amended information charged Labeaud with assault on Charles Tavolino with a deadly weapon (a cane), causing great bodily injury. (Pen. Code,[1] §§ 245, subd. (a)(1), 12022.7, subd. (a).) The information also alleged Labeaud had three prior serious felony convictions. (§§ 667, subds. (a)(1), (d); 1170.12, subd. (b).)

At trial, Flenard Jefferson testified he was a Marine Corps veteran. In August 2019, he lived with Labeaud and Tavolino in a residence for homeless veterans in Bellflower. Labeaud always carried a cane to help him walk.

At around 4:15 p.m. on August 11, 2019, Tavolino was in the back yard "probably drinking because that's what he does a lot." Labeaud knocked on the door to Jefferson's room and asked to see him. When Jefferson opened the door, Labeaud said: " 'I had to bust him upside his head. He called my mother a bitch and she ain't been long . . . dead.' " Labeaud went back to the kitchen, where he was cooking.

Jefferson went out to the back yard. Tavolino was sitting in a hammock chair talking on his phone. His head was bleeding and there was a puddle of blood. Tavolino yelled into the phone: " 'I want him arrested,' " and handed the phone to Jefferson.

---

[1]     All statutory references are to the Penal Code unless otherwise indicated.

In the transcript of the 911 call, Tavolino told the dispatcher: "My roommate just busted my head open and I need a cop. . . . I'm bleeding. I'm gushing blood from my head. . . . I want this dude arrested." He didn't know what Labeaud hit him with, but "[h]e hit me so hard on my head, my ears are ringing, bruh. He came out and just . . . . I was doing my tire. My head is just . . . . My ears are ringing. I couldn't see nothing. . . . He hit me with something. Not just his fist."

Paramedics arrived and treated Tavolino in the front yard. Labeaud came out with his cane, eating a hot dog.

Tavolino would drink beer or liquor every day starting around 3:00 p.m. "One minute he'd be cool, and next minute he'd be talking smack or crap or whatever" and acting erratically. Jefferson stayed out of his way after once intervening when he heard Tavolino and Labeaud in each other's face and exchanging insults. Tavolino often carried a pocket knife, but Jefferson never saw him use it in a threatening manner.

Tavolino testified he also was a Marine Corps veteran. When Labeaud moved in, he asked Tavolino if he ever slept with men, because " 'I'm high as fuck and horny as hell.' " Tavolino told Labeaud to take care of that himself, but Labeaud kept propositioning Tavolino.

On August 11, 2019, Labeaud came home after being gone for a few days and complained he was out of food stamps. Labeaud always was out of money and asking for food, money, and cigarettes, so Tavolino gave him $2.00 and a pack of hot dogs and told Labeaud to stay away from him. Labeaud went into the kitchen to cook, yelling through the open window that Tavolino was "a fucking faggot" and a bitch. Tavolino was sitting in the back yard, changing the inner tube on his bike tire. He

told Labeaud to leave him alone, and said, " 'Your mama's a bitch.' " Labeaud asked him what he said and Tavolino repeated: " 'Your mama's a bitch.' " He did not know Labeaud's mother had died recently.

Within two seconds, Tavolino saw Labeaud's sneakers in his peripheral vision. Before he could lift his head up, he was "smashed over the head." His sight went temporarily black and his ears rang. Tavolino could feel the blood running down his face and saw it pooling under the chair; he thought he was dying. Tavolino asked: " 'What the fuck did you hit me with, dude? . . . . That wasn't your fist.' " Labeaud responded with "some gay remark again." Tavolino picked up his phone, told Labeaud he was going to jail, and called 911.

Jefferson came out, took Tavolino's phone, and talked to the 911 operator. Jefferson told him to go to the front of the house to meet the ambulance, but Tavolino said he was not moving until the police got there and saw the puddle of blood: " 'I seen too much TV.' "

The police arrived at the back of the house, and after they saw the scene, Tavolino agreed to move to the front. They took photos and Jefferson talked to the police and paramedics. The police asked who did it and Tavolino pointed to Labeaud, who came outside eating hot dogs and acting as if he had no idea what had happened. The police arrested Labeaud.

Tavolino went to the hospital. After a CAT scan, they gave him six stitches. They did another CAT scan because he had bleeding on the brain. He stayed two nights, taking morphine for the pain. Later, he had headaches and tremors and went back for a third CAT scan. He had a permanent scar and a dent in his head.

Tavolino recognized Labeaud's brown cane in a photograph. He denied owning a pocket knife, pulling a knife on anyone, or being violent toward Labeaud. Tavolino had obsessive-compulsive disorder and post-traumatic stress disorder since just before he left the Marines 30 years ago. He had stopped drinking for 12 years, but started drinking again after the attack. He had the shakes and nonstop headaches.

A deputy sheriff responding to the scene saw paramedics helping Tavolino down the driveway towards the sidewalk. Tavolino said his attacker was inside the house. Just then, Labeaud came out of the front door, and Tavolino yelled: " 'That's that motherfucker, right there.' " Labeaud, upset and agitated, said he didn't do anything. The deputies arrested him and took the cane he had in his hand.

The emergency room doctor who treated Tavolino testified the CT scan showed bleeding in his brain. Tavolino told her he was working on something when his roommate hit him on the head with a cane.

A Los Angeles Police Department officer testified that on June 1, 2014, he and his partner were working in downtown Los Angeles when he heard someone yelling for help. Labeaud was holding a metal cane over his head, about to strike another man. The officers pulled up to the curb and took Labeaud into custody. The victim was bleeding profusely from the back of his head, and Labeaud's metal cane was slightly bent. Labeaud told the officers he asked the victim for a cigarette, felt threatened, and hit him over the head with the cane to defend himself. The victim refused medical care although he had an inch and a half laceration on the back of his head, with swelling and redness.

The defense presented no evidence.

The jury found Labeaud guilty of assault with a deadly weapon and found true that he inflicted great bodily injury. The court denied Labeaud's motion for new trial. Labeaud admitted his prior convictions. The court sentenced him to 25 years to life and added three years for great bodily injury. Labeaud filed a timely appeal.

## DISCUSSION

### 1. *The court did not abuse its discretion when it denied defense counsel's request for a continuance*

After speaking to his public defender at the start of his August 27, 2019 preliminary hearing, Labeaud stated he wanted to represent himself, agreed he had refused to waive time, and stated he was prepared to proceed. After advising Labeaud of his constitutional rights and the consequences of self-representation, the court granted his request.

At a hearing on September 10, 2019, Labeaud stated he wanted Louisa Pensanti to represent him. The court revoked his pro per privileges and stated Pensanti was his attorney of record. On October 18, 2019, Pensanti asked: "[C]an we make November 20th a 0 of whatever the court wants?" The court agreed to put the matter over to November 20 for 0 of 30. The prosecutor advised Labeaud: "[Y]ou have the right to have a trial in this matter within 32 days of today's date. Do you waive and give up that right and agree to go over to November 20th, 2019, to have your trial within 30 days of that date?" After an unreported bench conference, the court explained Pensanti "cannot be prepared for the next court date because she has to go into a serious trial on Monday. She can only do one trial at a time." Labeaud said he understood. The court explained Pensanti needed to be fully prepared for trial and was asking only for

6

a waiver until November 20 for 30 days.  Labeaud complained he had been in jail for three months, and Pensanti did not need to prepare because he was "falsely incarcerated."

The court told Labeaud he was being difficult, and was pushing Pensanti to go forward without time to prepare. "Because when you go to trial and should you get convicted, this will not be an appellate issue because you have decided not to waive time and let your counsel prepare.  I want to make that very clear for the record, sir."  Labeaud again refused to waive time.  The court continued:  "You won't answer the questions because you're intent on simply putting your case over for trial, irrespective of whether your counsel, who has just told the Court [she] has to start a serious and violent felony on Monday in another department.  And you don't care, and I understand that because . . . ."  Labeaud interrupted:  "I plead the Fifth Amendment."  The court continued:  "The record should reflect that Mr. Labeaud refuses to allow counsel to get ready and will not waive time.  And I understand that because it's your constitutional right.  But understand that when you get to trial, you will get to trial, and when you ask for a continuance then it may not be granted.  You have to understand that, sir.  This is not a game.  This is your case."  Labeaud complained the court would not let him talk, and the court continued:  "You do not need to talk to me.  You need to understand what I'm telling you. I am trying to look out for you, but you are not looking out for you."  When Labeaud rejoined the court was "[t]rying to look out for me by not letting me speak," the court reminded him he had chosen to be represented by counsel:  "You made that choice." The court turned to Pensanti:  "He refuses to waive time. What date are we going to?  Do you want to go straight to trial,

Miss Pensanti?" She answered "no," and agreed to return on November 4 (45 of 60).

Pensanti appeared telephonically on November 4 because she was engaged in a trial in Lancaster. The court found good cause to continue the case for 10 days. The court told Labeaud that immediately after the Lancaster case, Pensanti had a trial in Compton, and the court might have to put his case over another 10 days. It was unlikely that trial could begin in November, and the court offered the Monday after the first week of December "if you want to put it over to that date." Labeaud answered he did not, and asked for a "mercy hearing." When the court declined, he repeated he would not waive time: "I'm ready. I could go back pro per and defend myself." The court explained: "You don't get to go back and forth." Over Labeaud's continued objection, the court continued the case to November 12, and "that is to go, Counsel, to go."

On November 12, the court stated "[w]e are here for trial." Pensanti explained she had struggled to explain to Labeaud that she needed to be prepared to be effective, and she had just finished a four-week trial in Lancaster: "It would be absolutely ridiculous to start a trial today without even seeing the multitude of discovery" sent to her by the prosecutor.[2] "[M]y client has something about a speedy trial right that he seems to feel that it's the most important thing in the world, but he does not understand that he needs to have an attorney who is prepared." The court told Labeaud his attorney had just made a record

---

[2] The prosecutor explained the discovery included the 2014 incident in downtown Los Angeles when Labeaud hit another man in the head with his cane. Pensanti had represented Labeaud in that case.

why she was not prepared for trial that day, and "[i]t would be most wise and appropriate to let your counsel be prepared for your trial." The court pointed out this was a third strike case, and "so you're looking at 25 to life minimum." "It's because you're rushing her that you're putting yourself at that risk. [¶] And I am saying this to you so that the appellate court will then see, well, he was told very clearly she's asking for time, and it's a reasonable request, but it's up to you. She's correct, and you're correct. You have your right to a speedy trial. But that speedy trial right could sometimes be pushed back so that your lawyer can get properly prepared for your case." The court explained it would not continue the trial if he refused to waive time: "If you choose to push her, I will start trial today." Labeaud repeated he would not waive time.

Pensanti asked to be relieved as Labeaud's counsel and expressed "doubt as to his ability to understand what's going on." The court said Labeaud had been very clear, and refused to relieve Pensanti. The court offered two trial dates a few weeks later, but after initially seeming to agree, Labeaud said: "I don't want to waive time at all. Let's just go to trial right now." The court began jury selection.[3]

Labeaud characterizes the trial court's action as a refusal to grant a limited continuance, which was an abuse of discretion and prejudiced him. But the court made clear it believed a continuance was in Labeaud's best interest, counsel's request was reasonable, and if Labeaud did not waive time the court

---

[3]    At the prosecutor's suggestion, the court questioned Labeaud about his ability to assist counsel and his understanding of the proceedings, and reaffirmed it did not doubt Labeaud's ability to proceed.

would not continue the trial.  What the court did not do is override Labeaud's refusal to agree to a continuance under section 1382.  That was not an abuse of the court's discretion.

Section 1382, intended to amplify the fundamental constitutional guarantee of a speedy trial,[4] requires the court to dismiss the action if a defendant is not brought to trial within 60 days after the filing of the information "unless good cause to the contrary is shown."  (§ 1382, subd. (a)(2); *People v. Lomax* (2010) 49 Cal.4th 530, 552-553.)

At Pensanti's request the court agreed to continue the case to November 20, 2019, with the statutory clock reset to "0 of 30," but made clear it would not grant a continuance if Labeaud objected.  On November 12, Labeaud refused to accept the court's offer (which would have postponed the start of trial to after the first week of December) and insisted he did not want to waive time.  The court began trial after explaining the severe penalty and the risk Pensanti would not be adequately prepared to defend him.

If the court had forced the continuance on Labeaud over his objection, on appeal we might face his contention that the continuance violated his rights under section 1382.  But here, the trial court denied the continuance at Labeaud's request.  He has waived any claim of error.  A defendant " 'may not juggle his constitutional rights in an attempt to evade prosecution.  He may not demand a speedy trial and demand adequate representation, and, by the simple expedient of refusing to cooperate with his attorney, force a trial court to choose between the two demands, in the hope that a reviewing court will find

---

[4]     Labeaud's opening brief states "there are no constitutional speedy trial issues in this case," and we take him at his word.

10

that the trial court has made the wrong choice.' " (*People v. Lomax, supra,* 49 Cal.4th at p. 556.)

And Labeaud has not shown the required prejudice. (*People v. Doolin* (2009) 45 Cal.4th 390, 450-451.) The trial evidence was strong, including Jefferson's and Tavolino's testimony and the recording of Tavolino's 911 call. Labeaud's reply brief argues we should not focus on the evidence that *was* presented, but on the discovery counsel received while in trial in Lancaster and "on the evidence that *might have been* presented if counsel had been given the time to adequately prepare." (Italics added.) This "generalized statement[ ] [is] insufficient to demonstrate prejudice" (*People v. Verdugo* (2010) 50 Cal.4th 263, 282), especially as appellate counsel was Labeaud's trial counsel.

## 2. *Labeaud has waived the issue of the exclusion of evidence of Tavolino's propensity for violence*

After Jefferson testified that he had defused an earlier confrontation between Labeaud and his victim Tavolino, defense counsel asked Jefferson if Tavolino ever threatened Jefferson or continued to behave "that way" toward him after Labeaud's attack on Tavolino. The court sustained the prosecutor's objections and interposed its own objections. Counsel requested a sidebar and confirmed she wanted Jefferson to testify about interactions he had with Tavolino, to show Tavolino's pattern of violence and threats toward Labeaud: "It's a question of self-defense." The court found interactions between Tavolino and Jefferson after Labeaud attacked Tavolino were irrelevant, and it would not "permit the questioning of anything that's happened between [Tavolino] and anyone else after the date of this incident." When questioning resumed, defense counsel asked

11

Jefferson if he had been threatened before the incident and he said no. On redirect, the prosecutor asked Jefferson if he ever saw Tavolino raise his pocketknife at Jefferson or anyone else "in any kind of threatening manner," and Jefferson answered no. On recross-examination, defense counsel asked if Jefferson ever saw Tavolino cut himself with his pocketknife. Jefferson answered yes, and when asked when, replied it was after the incident. Counsel asked whether Tavolino was drunk at the time, and the court sustained the prosecutor's objection.

At sidebar, the prosecutor objected that any questions about interactions between Jefferson and Tavolino after the incident were irrelevant. Defense counsel responded it went to Tavolino's violence, and Jefferson had received threats after the incident. The court replied: "[I]f you're going to be making that as a defense in this case, you're entitled to do that after the case in chief has been put on." But at this point, the questions were irrelevant because Jefferson's testimony about the attack on Tavolino was very clear, and nothing showed any kind of violence by Tavolino. "[Y]ou're entitled to present your defense, but it has to be presented appropriately. . . . I am not saying you can't have your defense. It's just it has to be placed in appropriate timing with regard to the evidence that we've already received." Counsel responded: "That makes sense," and the court sustained the prosecutor's objection.

Labeaud argues the court abused its discretion. We disagree. First, the court allowed counsel to ask Jefferson about any threats or violence by Tavolino before the August 2019 incident, and Jefferson testified he saw none. Tavolino's behavior before Labeaud attacked him was relevant to any claim that Labeaud acted in self-defense, and the defense tried but failed

12

to elicit such testimony.  Second, the court explained defense counsel could present evidence about post-incident threats or violence by Tavolino when it put on its case, and counsel agreed that made sense.  Counsel did not present any evidence or testimony after the prosecution rested.  She may not now complain that the court abused its discretion when it invited her to present the evidence at what she agreed was the appropriate time.

### 3.  *The court did not abuse its discretion when it admitted the 2014 incident*

Defense counsel objected to the admission into evidence of the 2014 incident when police arrested Labeaud after they saw him holding his cane over his head, poised to hit a man who had already been struck in the back of the head.  Counsel argued the evidence was prejudicial to Labeaud.  The court agreed, but admitted the evidence: "That's the whole purpose of that type of evidence, to be prejudicial . . . .  If it is just to show propensity, it is not allowable.  But if it is to show a common plan or intent, then similar to here, then it is permissible because then it would be more probative than prejudicial."

The court correctly stated the law.  Evidence Code section 1101, subdivision (a) prohibits the admission of evidence of a person's character or traits to show his or her conduct on a specified occasion.  But subdivision (b) allows the admission of evidence that a person committed another crime if relevant to prove a common design or plan.  (*People v. Kipp* (1998) 18 Cal.4th 349, 369.)  The other crime must be similar enough to the charged conduct to support a rational inference that both were committed with a common plan:  " '[T]he common features must indicate the existence of a plan rather than a series of

13

similar spontaneous acts, but the plan thus revealed need not be distinctive or unusual.' " (*Id*. at p. 371.) Because the question is essentially one of relevance, we review the trial court's admission of the evidence for an abuse of discretion. (*Id*. at p. 369.)

In 2014, Labeaud struck a man over the head with his cane, causing the man to bleed profusely from a wound on the back of his head. In 2019, Labeaud struck Tavolino over the head with his cane as Tavolino's head was bent over his bike repair, causing Tavolino to bleed profusely from a wound on his head. The incidents are similar enough to support the rational inference that Labeaud acted with a common plan to use his cane to hit in the head men he thought threatened him or with whom he had argued.

The probative value of the 2014 offense was substantial, and was not outweighed by the probability that its admission would create a serious danger of undue prejudice, of confusing the issues, or of misleading the jury. (Evid. Code, § 352; *People v. Kipp*, *supra*, 18 Cal.4th at p. 371.) The 2014 and 2019 crimes shared distinctive features (a blow to the head with Labeaud's cane) probative of a common plan. Evidence of the two crimes came from different sources. (*Kipp*, at p. 371.) And although the danger of undue prejudice is always present when other crimes evidence is admitted, the prejudicial effect was not unusually serious. The 2014 assault was not significantly more inflammatory than the 2019 assault, compelling evidence showed Labeaud committed both crimes, and the court correctly instructed the jury that it could not consider the 2014 crime to show that Labeaud had a bad character or was predisposed to commit crimes. (*Id*. at p. 372.) The trial court did not abuse its discretion.

14

## 4.    *The trial court did not commit instructional error*

Labeaud argues the trial court erred when it refused to give instructions on imperfect self-defense and the lesser-included offense of simple assault.

### a.    *Imperfect self-defense*

After the prosecution rested its case, defense counsel requested an instruction on imperfect self-defense, because "if Mr. Labeaud did the act, he did it in self-defense after what Mr. Tavolino described as a heated exchange and fighting words [' "your mama's a bitch" ']," and Tavolino might have had his knife with him at the time of the exchange, although he had testified to the contrary.  The prosecutor said there was no substantial evidence to support a self-defense instruction, and no evidence Tavolino had the knife.  The court agreed there was no evidence of self-defense.  Labeaud was inside and Tavolino was outside in the back yard, words were exchanged, and then Labeaud left the house, walked over to Tavolino, and hit him on the head.  Defense counsel argued Tavolino had threatened other people before and after the incident, "and I was not allowed to have that in. . . .  Everyone was threatened by Mr. Tavolino."  The court repeated there was no evidence of threats against others and such evidence would be irrelevant.  The defense rested.

A trial court has the duty to instruct on general principles necessary for the jury's understanding of the case.  (*People v. Montoya* (1994) 7 Cal.4th 1027, 1047.)  We review de novo the trial court's decision not to instruct on imperfect self-defense.  (*People v. Simon* (2016) 1 Cal.5th 98, 133.)  "[I]mperfect self-defense occurs when a defendant acts in the actual but unreasonable belief that he or she is in imminent danger of

15

great bodily injury or death," thus making a killing without malice aforethought, and not murder but manslaughter. (*Id.* at p. 132.) It is not an affirmative defense, but "a shorthand way of describing one form of voluntary manslaughter." (*Ibid.*; *People v. Trujeque* (2015) 61 Cal.4th 227, 271.) "This doctrine is limited to the negation of the malice element of murder." (*People v. Rodarte* (2014) 223 Cal.App.4th 1158, 1168; *People v. Iraheta* (2014) 227 Cal.App.4th 611, 623-624.) Where the jury is not asked to find the defendant harbored the "malice aforethought" required for murder, an instruction on imperfect self-defense is inappropriate. (*Iraheta*, at p. 624.) An imperfect self-defense instruction would have been inappropriate here.

Further, even if the doctrine applied, no substantial evidence supported the contention that Labeaud had an actual belief in the need for self-defense and feared immediate harm that required an immediate response. (*People v. Beck* (2019) 8 Cal.5th 548, 648-649.) There was no evidence that Tavolino attacked Labeaud. Instead, testimony by Jefferson and Tavolino showed that Labeaud came out of the kitchen and "executed a surprise attack" on an unsuspecting Tavolino, who was sitting in the back yard changing the tube in his bike tire. (*Id.* at p. 649.)

b. *Simple assault*

A trial court has the duty to instruct on lesser included offenses where there is substantial evidence from which a rational jury could conclude the defendant committed the lesser offense, but not the greater, charged offense. (*People v. Whalen* (2013) 56 Cal.4th 1, 68.) Simple assault is a lesser included offense to assault with a deadly weapon. (*People v. McDaniel* (2008) 159 Cal.App.4th 736, 747-748.) It is for the court to decide whether the evidence supports the instruction, and we review

16

independently whether the trial court erred. (*People v. Trujeque* (2015) 61 Cal.4th 227, 271.)

Simple assault is an unlawful attempt, combined with the present ability, to commit a violent injury on another. (§ 240.) Simple assault does not require the specific intent to cause injury, or the subjective awareness that an injury might occur, but only "an intentional act and actual knowledge of those facts sufficient to establish that the act by its nature will probably and directly result in the application of physical force against another." (*People v. Williams* (2001) 26 Cal.4th 779, 790.) As the jury was instructed, assault with a deadly weapon requires the defendant to use "any object, instrument, or weapon that is . . . capable of causing and likely to cause death or great bodily injury," which in turn is "significant or substantial physical injury. It is an injury that is greater than minor or moderate harm." (See *People v. Aguilar* (1997) 16 Cal.4th 1023, 1028-1029.)

We see no substantial evidence from which a rational jury could conclude that Labeaud committed an assault *without* a deadly weapon. All the evidence showed that he hit Tavolino in the head with his cane, which certainly was capable of causing significant physical injury. We reject Labeaud's argument there was no "actual proof" that he was in the yard or wielded the cane. The question is whether there was substantial evidence that he did not use an object likely to cause more than minor or moderate harm. Given the extent of Tavolino's injuries—copious blood, bleeding on the brain, a permanent scar and dent—the only rational verdict the jury could reach was an assault with a deadly weapon.

## 5. *Sufficient evidence supports the verdict*

Labeaud argues the evidence was insufficient to support his conviction, as there was "little evidence" he committed the assault, Tavolino did not lose consciousness and declined medical treatment, the large amount of blood was not a sign of serious injury but of the "high concentration of blood vessels in the head," the doctor testified that Tavolino did not suffer a brain bleed, and he suffered no lasting damage. First, almost all those contentions are directly contrary to the trial testimony as described above, and those that are not contradicted are speculation. Second, Labeaud misapprehends the substantial evidence standard. We view the evidence in the light most favorable to the jury's findings, and we will reverse for insufficient evidence only if it appears that upon no hypothesis whatever is there substantial evidence to support the verdict. (*People v. Hoffman* (2021) 61 Cal.App.5th 976, 978.) Substantial evidence supports the verdict.

## 6. *The trial court did not abuse its discretion when it refused to strike Labeaud's prior convictions*

At sentencing, the court stated: "Defendant has been convicted of 16 inclusive cases starting 1988 to current. In 2014 alone there are two cases of [§] 245, one very similar to this case factually, and the other was a [§] 245(a)(4) where he strikes someone with . . . the cane." The court looked for mitigating factors and noted Labeaud was a veteran who had been in residential drug treatment and "substantial mental health treatment" for military veterans. All Labeaud's past sentences had taken into consideration his mental health and his status as a veteran: "[T]hey've given him every ample opportunity to try to benefit from the services that were offered to him.

18

He simply didn't.  He simply chose a different path. [¶] So the mitigating factor is ostensibly he's a veteran.  He served his country.  But after that he had many options, and he did not comply."  The court wanted to make clear it had taken his service into account, but "[e]verything else is aggravating."  The court outlined the sentencing options, including a Three Strikes sentence of 25 years to life with 3 years for great bodily injury, and with one strike, a determinate sentence of 16 years.

Labeaud's counsel did not submit a sentencing brief.  She argued Labeaud had "other mitigating qualities," including a clear mental illness, and "should be in a mental health facility rather than putting somebody in custody for a long period of time. . . .  I guess I would request if the court is thinking of the 16-year determinate sentence, that at least the five-year strike prior be not used."  The prosecutor asked the court not to strike all three of the prior strikes.

The court stated it had taken everything into consideration and had a clear picture of Labeaud's history.  The judicial system was not the mental health system, and Labeaud's past counsel had raised mental health concerns in the two prior cases:  "[H]e was given all sorts of services. [¶] We can only do so much, and the statement is you can only lead a horse to water.  We know what addiction is.  We know what mental health issues are.  We get trained and educated on all of this."  Here, the judicial system did what it could "and the defendant didn't follow through.  And that lies on the defendant. . . . [¶] The defendant was given ample opportunity.  I am not inclined to *Romero* the strikes because the purpose of three strikes in the state of California was for this.  You were given chance after chance after chance.  I only pulled two cases.  Chance after chance after chance, and you didn't

19

figure it out."  Labeaud was an "exemplar of what [the three strikes] legislation wants to stop, and my job is to make sure it does. [¶] The Court is going to adopt the Three Strikes sentencing, which is 25 [years] to life, as the base term with three years for GBI.  That's 28 years."

First, Labeaud has forfeited his federal constitutional claim that his sentence is cruel and unusual punishment violating the Eighth Amendment.  A claim that a sentence is cruel or unusual "requires a 'fact-specific' inquiry and is forfeited if not raised below."  (*People v. Baker* (2018) 20 Cal.App.5th 711, 720; *People v. Rodriguez* (2019) 40 Cal.App.5th 194, 203-204.)  "[T]he onus was on [defendant's] counsel to object on that basis."  (*Baker*, at p. 720.)  Defense counsel did not do so.

Second, the court did not abuse its discretion when it did not exercise its power to strike Labeaud's prior strike convictions under *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497, 530.

The purpose of the Three Strikes law is to punish recidivists more harshly, but the court has the power to strike or dismiss a prior conviction in furtherance of justice if a recidivist defendant does not fall within the spirit of the law.  (§ 1385, subd. (a); *People v. Avila* (2020) 57 Cal.App.5th 1134, 1140.)  The court considers "whether, in light of the nature and circumstances of the defendant's present felonies and prior serious and/or violent felony convictions, and the particulars of the defendant's background, character, and prospects, the defendant may be deemed outside the scheme's spirit, in whole or in part, and hence should be treated as though the defendant had not previously been convicted of one or more serious and/or violent felonies."  (*Avila*, at p. 1140.)  We review for an abuse of

discretion, and Labeaud has the burden to show the sentencing decision was "irrational or arbitrary." (*Ibid*.) As only extraordinary circumstances justify a finding that a career criminal is outside the Three Strikes law, " 'the circumstances where no reasonable people could disagree that the criminal falls outside the spirit of the three strikes scheme must be even more extraordinary.' " (*Ibid*.)

Labeaud has not met his burden to show the trial court acted irrationally or arbitrarily. The trial court properly considered factors relevant to the nature and circumstances of Labeaud's prior strikes. Given the number of prior offenses (16), the details of prior convictions of assault with a deadly weapon, and the multiple opportunities he had to address his addiction and mental health issues, Labeaud's military service did not take him out of the law's spirit. This is not an extraordinary case, and the trial court did not abuse its discretion.

### DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


EGERTON, J.

We concur:



EDMON, P.J.                                        LAVIN, J.