Filed 11/6/24  P. v. Quintero CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B315403 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. KA118106-02) |
| v. | |
| JOSEPH ANDREW QUINTERO, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Victor D. Martinez, Judge.  Affirmed.

Richard B. Lennon and Olivia Meme, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Kenneth C. Byrne, Supervising Deputy Attorney General, Allison H. Chung, Deputy Attorney General, for Plaintiff and Respondent.

_____

Joseph Andrew Quintero appeals from a judgment of conviction entered after a jury found him guilty of the first degree murder of Ibrahim Zepeda. Quintero contends on appeal that the trial court erred in denying his request to instruct the jury on self-defense and the lesser-included offense of voluntary manslaughter based on imperfect self-defense. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A.  *Evidence at Trial*

On the afternoon of September 23, 2012 Quintero was at the mall with his friend David Sanchez[1] and the men's girlfriends. Quintero and Sanchez were known members of the KHA gang, and Quintero was an influential member. Also at the mall that day were Zepeda and his girlfriend, Yesenia Rodriguez. Zepeda was a member of the Northside Baldwin Park gang, which was a rival of KHA. Zepeda was known in the community to have a reputation for violence.

Shortly after 4:00 p.m., Zepeda and Rodriguez were walking through the mall food court when Zepeda told Rodriguez to "stay back" and sit down at a table. Zepeda walked toward Quintero and Sanchez, who moved in the direction of Zepeda. Rodriguez was unable to hear what the men were saying, but she testified they seemed to be arguing. The conversation lasted less than five minutes, after which Zepeda returned to Rodriguez and told her to call her mother to come pick them up at the mall.

---

[1]  Quintero and Sanchez were tried together with separate juries.

2

A few minutes later, as Zepeda and Rodriguez were leaving the mall, they encountered Quintero and Sanchez again. The men began arguing with raised voices. Although Rodriguez testified she could not remember what the men were saying, she previously told a police detective after the incident that Quintero and Sanchez called Zepeda a derogatory term for members of the Northside Baldwin Park gang. After approximately one minute, the confrontation ended, and Zepeda and Rodriguez walked toward the mall exit on the south side of the mall. When they got outside they went to a bench and waited for Rodriguez's mother to arrive.

Quintero and Sanchez left the mall with their girlfriends around the same time and went to their vehicle—a blue truck parked on the north side of the mall. Surveillance footage showed the blue truck travelling west and turning left onto the road circling the mall. The blue truck travelled southwest and stopped approximately 15 feet from where Zepeda and Rodriguez were sitting. The truck backed up, turned into one of the parking aisles, and parked.

Quintero and Sanchez got out of the truck and walked toward Zepeda and Rodriguez. At that point Rodriguez's mother arrived. Zepeda told Rodriguez to get in her mother's car, and he took a few steps forward to meet Quintero and Sanchez. The men began arguing, and Zepeda took a step backward, making an arm gesture that one witness understood to be a challenge. The men then started fighting. Rodriguez testified she thought Quintero and Sanchez started the fight, but she was not sure. After approximately 10 seconds of fighting, Quintero took a screwdriver out of his pocket and stabbed Zepeda repeatedly in his back. Zepeda was between Quintero and Sanchez, with

Sanchez punching Zepeda from the front.  Zepeda told Quintero and Sanchez to stop, and he fell to the ground.  Quintero and Sanchez continued to stab, kick, and hit Zepeda while he was on the ground.  According to Rodriguez, Zepeda did not pull out a weapon.  Once the fight stopped, Quintero and Sanchez ran toward their truck.  Zepeda got into Rodriguez's mother's car, and they drove to the hospital.  Zepeda died at the hospital from multiple stab wounds.

Several years later Quintero was interviewed by police detectives in connection with Zepeda's murder.[2]  A videotaped recording of the interview was played for the jury.  At the beginning of the interview Quintero said he did not remember anything about the day Zepeda was killed.  He explained he had been shot in the face a year or two before the interview, and he had difficulty remembering anything from before his injury.

After he had been questioned for a few minutes and shown images taken from the mall surveillance footage, Quintero said things were "coming back" to him.  He told the detectives Zepeda had threatened him, either inside or outside the mall, saying "I'll kill you and your whole family."  Quintero continued, "I remember a black glove and if you're in—you're around the neighborhood, you know, if you have gloves, it's because you have a gun.  My life was in danger. . . .  I just remember just him telling me.  That's it.  'I'll end you.  I'll kill your family.'  And— and the—then, he put [on] a glove before he could really, like, do anything, I remember getting hit."  Quintero later said, "I

---

[2]    At trial one of the detectives stated his interview with Quintero took place in May 2018;  however, the transcription of the interview that was provided to the jury states the interview occurred in July 2017.

4

thought he was gonna grab a gun" so Quintero "just kept fighting."

Quintero told the detectives he "would never hurt no one" and "would never, deliberately, start a fight." However, he admitted that before his son was born in 2013, he did "a lot of stupid shit. A lot, dude. Beating people up, jumping into cars, knocking people out, you know. . . . [I]f [someone] had a problem with me . . . I'll find them."

B.    *Request for Self-defense Jury Instructions*

After the parties rested their cases,[3] Quintero's attorney renewed a request that the trial court instruct the jury on self-defense and imperfect self-defense. The attorney argued Zepeda had initiated the encounter in the food court, Zepeda had challenged Quintero and Sanchez outside the mall, and Quintero believed deadly force was imminent. The court disagreed, emphasizing that Quintero and Sanchez left the mall, drove around to where Zepeda was sitting, and confronted him. The court stated, "That changes the evaluation because once [Quintero and Sanchez] become—they're the ones that become the aggressors. Once they are the ones that engage, we now have either that they were the aggressors or the minimu[m] . . . , mutual combat." The court asked defense counsel whether the men "at least agreed to participate in mutual combat," to which Quintero's attorney replied, "At the very least." The court later reiterated that counsel "conceded at a minimum there was mutual combat" and "all parties agreed this was at a minimum mutual combat." On this basis the court found there was not

---

[3]    Quintero and Sanchez did not present any evidence or witnesses.

5

substantial evidence to support the self-defense and imperfect self-defense instructions.

C.    *Jury Verdict and Sentencing*

The jury found Quintero guilty of first degree murder (Pen. Code, § 187, subd. (a))[4] and found true the special allegations Quintero personally used a deadly weapon (§ 12022, subd. (b)(1)) and committed the murder for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)(C)).

In a bifurcated bench trial, the trial court found Quintero had two prior convictions for robbery that qualified as serious or violent felonies within the meaning of the three strikes law (§§ 667, subds. (b)-(i), 1170.12) and section 667, subdivision (a)(1).[5]  The trial court granted Quintero's *Romero*[6] motion to strike one prior conviction for purposes of sentencing but denied his request to strike the other prior conviction.

The court sentenced Quintero to an indeterminate term of 50 years to life, consisting of 25 years to life for murder, doubled under the three strikes law.  The court dismissed the remaining special allegations under section 1385.

D.    *Denial of the Motion for New Trial*

Prior to sentencing, the trial court heard argument on Quintero's motion for a new trial based on the court's refusal to

---

[4]    Further statutory references are to the Penal Code.

[5]    The prosecution did not proceed on a third alleged prior conviction for assault, and the court found that allegation not true.

[6]    *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497, 504.

instruct the jury on self-defense and imperfect self-defense. The court denied the motion, stating it did not raise any new arguments that had not been addressed in the jury instruction conference. The court reiterated Quintero had engaged in mutual combat and, construing the facts most favorably to Quintero, "even if believed that the victim put on gloves and defendant thought this meant he had a weapon, a reasonable jury could not find that this equated to a sudden and deadly force by the victim justifying killing the victim."

## DISCUSSION

A.    *Governing Law and Standard of Review*

With respect to homicide, "[s]elf-defense, when based on a *reasonable* belief that killing is necessary to avert an imminent threat of death or great bodily injury, is a complete justification, and such a killing is not a crime." (*People v. Elmore* (2014) 59 Cal.4th 121, 133-134; see § 197, subds. (1) & (2) [homicide is justifiable "[w]hen resisting any attempt to murder any person, or to commit a felony, or to do some great bodily injury upon any person" and "[w]hen committed in defense of habitation, property, or person, against one who manifestly intends or endeavors, by violence or surprise, to commit a felony"]; see also CALCRIM No. 505.) "For killing to be in self-defense, the defendant must actually and reasonably believe in the need to defend." (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1082 (*Humphrey*); accord, *People v. Horn* (2021) 63 Cal.App.5th 672, 682; *People v. Rodarte* (2014) 223 Cal.App.4th 1158, 1168 ["Perfect self-defense requires that a defendant have an honest and reasonable belief in the need to defend himself or herself."].)

7

A murder charge may also be mitigated by imperfect self-defense.  "If the belief [in the need to defend oneself] subjectively exists but is objectively unreasonable, there is 'imperfect self-defense,' i.e., 'the defendant is deemed to have acted without malice and cannot be convicted of murder,' but can be convicted of manslaughter." (*Humphrey, supra*, 13 Cal.4th at p. 1082; accord, *People v. Horn, supra*, 63 Cal.App.5th at p. 682; see *People v. Booker* (2011) 51 Cal.4th 141, 182 ["Imperfect self-defense is the killing of another human being under the actual but unreasonable belief that the killer was in imminent danger of death or great bodily injury."]; CALCRIM No. 571.)  Thus, imperfect or "[u]nreasonable self-defense is 'not a true defense; rather, it is a shorthand description of one form of voluntary manslaughter.'" (*People v. Elmore, supra*, 59 Cal.4th at p. 134; accord, *People v. Barton* (1995) 12 Cal.4th 186, 200; see *In re Christian S.* (1994) 7 Cal.4th 768, 773 ["'An *honest but unreasonable* belief that it is necessary to defend oneself from imminent peril to life or great bodily injury negates malice aforethought, the mental element necessary for murder, so that the chargeable offense is reduced to manslaughter.'"].)

"[S]elf-defense . . . whether perfect or imperfect, require[s] an actual fear of *imminent* harm." (*People v. Butler* (2009) 46 Cal.4th 847, 868; accord, *People v. Rodarte, supra*, 223 Cal.App.4th at p. 1168 ["'The defendant's fear must be of *imminent* danger to life or great bodily injury.'"].)  "'Fear of future harm—no matter how great the fear and no matter how great the likelihood of the harm—will not suffice. . . .  '"[T]he peril must appear to the defendant as immediate and present and not prospective or even in the near future.  An imminent peril is one that, from appearances, must be instantly dealt with."'" (*People*

8

*v. Manriquez* (2005) 37 Cal.4th 547, 581, italics omitted.) "All the surrounding circumstances, including prior assaults and threats, may be considered in determining whether the accused perceived an imminent threat of death or great bodily injury." (*People v. Battle* (2011) 198 Cal.App.4th 50, 72; see *Humphrey, supra,* 13 Cal.4th at p. 1083 ["Although the ultimate test of reasonableness is objective, in determining whether a reasonable person in defendant's position would have believed in the need to defend, the jury must consider all of the relevant circumstances in which defendant found herself."].)

As a general matter, "'[a] trial court must give a requested [jury] instruction only if it is supported by substantial evidence, that is, evidence sufficient to deserve jury consideration.'" (*People v. Leon* (2020) 8 Cal.5th 831, 848; accord, *People v. Nguyen* (2015) 61 Cal.4th 1015, 1049 ["'[J]ust as with perfect self-defense or any defense, "[a] trial court need give a requested instruction concerning a defense *only if there is substantial evidence to support the defense*."'"]; *People v. Larsen* (2012) 205 Cal.App.4th 810, 823 ["'[A] trial judge' . . . 'has the authority to refuse requested instructions on a defense theory for which there is no supporting evidence.'"].) "'"[B]efore a jury can be instructed that it may draw a particular inference, evidence must appear in the record which, if believed by the jury, will support the suggested inference."'" (*People v. Alexander* (2010) 49 Cal.4th 846, 920-921; accord, *Larsen*, at p. 823 ["Substantial evidence in this context '"is 'evidence sufficient "to deserve consideration by the jury," not "whenever *any* evidence is presented, no matter how weak."'"'"].) An instruction is not required where only "[s]peculative, minimal, or insubstantial evidence" supports the instruction. (*People v. Simon* (2016) 1 Cal.5th 98, 132, 134.) In

9

deciding whether to give a defense instruction, the court must "view the evidence in the light most favorable to the defendant." (*People v. Millbrook* (2014) 222 Cal.App.4th 1122, 1137.)

When a defendant's request for a jury instruction has been refused, we review the record de novo to determine whether there was substantial evidence that required giving the instruction. (*People v. Simon, supra*, 1 Cal.5th at p. 133.)

B.     *The Trial Court Did Not Err in Refusing Quintero's Request for Self-defense Jury Instructions*

On appeal, Quintero argues the trial court erred in refusing to instruct the jury on self-defense and imperfect self-defense because there was evidence from which the jury could have found Quintero "had an actual belief that Zepeda posed imminent harm to his life." However, as the trial court explained and Quintero's attorney conceded at trial,[7] at the very least Quintero was engaged in mutual combat (or was the initial aggressor), which prevented him from asserting his actions were justified by self-defense.

A person who is the initial aggressor in a fight or who engages in mutual combat may not rely on the doctrine of self-

_____

[7]     Although Quintero's counsel conceded at trial that Quintero engaged in mutual combat, Quintero has not forfeited his challenge based on instructional error because any error potentially affects his substantive rights. (§ 1259 ["The appellate court may also review any instruction given, refused or modified, even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby"]; *People v. Gutierrez* (2018) 20 Cal.App.5th 847, 856, fn. 8 ["when an instruction allegedly affects the substantial rights of the defendant, it is reviewable even in the absence of an objection"].)

10

defense unless he or she "actually and in good faith tried to stop fighting" and "indicated, by word or conduct, to [his] opponent, in a way that a reasonable person would understand, that [he] wanted to stop fighting and that [he] had stopped fighting." (CALCRIM No. 3471; accord, § 197, subd. (3) [homicide is justifiable when committed in self-defense, but if the defendant "was the assailant or engaged in mutual combat, [he or she] must really and in good faith have endeavored to decline any further struggle before the homicide was committed"]; *People v. Holt* (1944) 25 Cal.2d 59, 66 ["[W]hen a defendant seeks or induces the quarrel which leads to the necessity for killing his adversary, the right to stand his ground is not immediately available to him, but, instead, he must first decline to carry on the affray and must honestly endeavor to escape from it. Only when he has done so will the law justify him in thereafter standing his ground and killing his antagonist."].)

"'[A]s used in this state's law of self-defense, "mutual combat" means not merely a reciprocal exchange of blows but one *pursuant to mutual intention, consent, or agreement preceding the initiation of hostilities. . . .* In other words, it is not merely the combat, but the *preexisting intention to engage in it*, that must be mutual.'" (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1044; accord, *People v. Ross* 155 Cal.App.4th 1033, 1047 [mutual combat requires "evidence from which the jury could reasonably find that *both combatants actually consented or intended to fight before the claimed occasion for self-defense arose*"].)

In this case, there is no reasonable interpretation of the evidence other than that Quintero and Sanchez intended to fight with Zepeda when they approached him outside the mall. Quintero and Sanchez did not have a chance encounter with

11

Zepeda in the parking lot; rather, they deliberately sought him out by stopping the truck, backing it up to drive into a parking space, then leaving the vehicle to approach Zepeda. Quintero's and Sanchez's intention to fight is further evidenced by the fact they and Zepeda were from rival gangs, Quintero and Sanchez had two escalating encounters with Zepeda within a short period of time, and Quintero and Sanchez had insulted Zepeda and his gang. Further, once Zepeda gestured his arms in a challenge, Quintero did not protest or attempt to leave; by staying, he impliedly agreed to fight. The only reasonable inference from this evidence is that the three men intended to fight. Having engaged in mutual combat, and absent any evidence Quintero attempted to withdraw (and there was none), there was no substantial evidence to support a self-defense instruction.

Quintero argues this finding is contradicted by his statement to police that he would never start a fight. Even construing the evidence in a light most favorable to Quintero, his statement is not inconsistent with a finding of mutual combat. Quintero clarified that prior to the birth of his son in 2013, he engaged in many fights ("[b]eating people up" and "knocking people out"), and he would seek out someone who had a problem with him or with whom he had a problem. Thus, his statement to police that he would not start a fight does not provide substantial evidence he did not intend to fight with Zepeda in 2012.

In certain situations, a defendant who engages in mutual combat may regain the right to assert self-defense if the victim's ""counter assault is so sudden and perilous that no opportunity be given to decline further to fight and [the defendant] cannot retreat with safety . . . ."" (*People v. Salazar* (2016) 63 Cal.4th 214, 249; accord, *People v. Quach* (2004) 116 Cal.App.4th 294,

12

301-302; see CALCRIM No. 3471 ["However, if the defendant used only non-deadly force, and the opponent responded with such sudden and deadly force that the defendant could not withdraw from the fight, then the defendant had the right to defend [himself] with deadly force and was not required to try to stop fighting[,/ or] communicate the desire to stop to the opponent[, or give the opponent a chance to stop fighting]."].)

Quintero contends that seeing Zepeda put on a black glove, which suggested he had a gun, made Quintero fear for his life. However, Quintero has not argued, nor could he, that the appearance of the glove alone was a sudden and deadly show of force. It is undisputed that Zepeda never drew or showed a weapon, and there is no evidence Quintero could not safely retreat. Nor was Quintero's statement to the detectives that at some point—inside or outside the mall—Zepeda said he would kill Quintero's family a sudden and deadly show of force during the fight. At most it can be inferred that Quintero had a subjective fear of sudden and deadly force, but that is insufficient to support Quintero's assertion of a right to self-defense once he had engaged in mutual combat.

## DISPOSITION

The judgment is affirmed.


FEUER, J.

We concur:


MARTINEZ, P. J.          STONE, J.

13