Filed 10/10/25  P. v. Martin CA3

<u>NOT</u> <u>TO</u> <u>BE</u> PUBLISHED

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>　　v.<br><br>TYRICE MARTIN,<br><br>　　　Defendant and Appellant. | C100060<br><br>(Super. Ct. No. 21FE019167)<br><br>MODIFICATION OF OPINION AND DENIAL OF PETITION FOR REHEARING<br><br>[NO CHANGE IN JUDGMENT] |

THE COURT:

Defendant filed a petition for rehearing with this court.  It is hereby ordered that the petition for rehearing is denied.

It is also ordered that the opinion filed herein on September 22, 2025, be modified as follows:

1

1. On page 2 the last sentence of the first full paragraph currently reads: "Because we agree with the parties that the sentencing minute order contains clerical errors, we will direct the trial court to correct those errors." The word "sentencing" is to be deleted and replaced with "August 24, 2023." That sentence will now read:

Because we agree with the parties that the August 24, 2023, minute order contains clerical errors, we will direct the trial court to correct those errors.

2. On page 20 under the heading *Clerical Errors*, the first sentence currently reads: "We agree with the parties that the sentencing minute order incorrectly makes two references to defendant being found guilty of voluntary manslaughter." The word "sentencing" is to be deleted and replaced with "August 24, 2023." That sentence will now read:

We agree with the parties that the August 24, 2023, minute order incorrectly makes two references to defendant being found guilty of voluntary manslaughter.

This modification does not change the judgment.

FOR THE COURT:


_____/s/_____
Duarte, Acting P. J.


_____/s/_____
Renner, J.


_____/s/_____
Feinberg, J.

2

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

|  |  |
|---|---|
| THE PEOPLE, | C100060 |
| Plaintiff and Respondent, | (Super. Ct. No. 21FE019167) |
| v. | |
| TYRICE MARTIN, | |
| Defendant and Appellant. | |

In November 2021, defendant Tyrice Martin accidentally shot and killed his seven-year-old niece Isabel during an altercation with Clifford Hall, whom defendant also shot and killed.  A jury found defendant guilty of second degree murder (Pen. Code, § 187, subd. (a)),[1] involuntary manslaughter (§ 192, subd. (b)), and felon in possession of a firearm (§ 29800, subd. (a)(1)).  The jury also found true the firearm enhancement allegations. (§§ 12022.53, subds. (b)-(d), 12022.5, subd. (a).)  In a bifurcated proceeding, the trial court

---

[1]  Undesignated statutory references are to the Penal Code.

found that defendant had committed the offenses while out on bail (§ 12022.1) and had a prior serious felony conviction (§ 667, subd. (a)) that qualified as a strike under the three strikes law. (§§ 1170.12, subds. (a)-(d), 667, subds. (b)-(i).) The court also found true the various alleged aggravating circumstances. After denying defendant's motion to dismiss his prior strike under *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497,[2] the court sentenced him to an aggregate term of 72 years and four months to life in prison.[3]

Defendant appeals, contending first that the trial court committed prejudicial evidentiary error by improperly excluding evidence that Isabel had fentanyl in her system at the time of her death. He argues this evidence was relevant and admissible to impeach the credibility of her parents (defendant's brother and sister-in-law), who were eyewitnesses to the shooting and other relevant events. Second, defendant contends the trial court erred by denying his *Romero* motion. We disagree with these contentions and affirm the judgment. Because we agree with the parties that the sentencing minute order contains clerical errors, we will direct the trial court to correct those errors.

## FACTUAL BACKGROUND

Given the limited nature of the issues raised on appeal, we briefly summarize the relevant facts. In doing so, we are mindful that the defense theory at trial was that defendant acted in self-defense. The defense did not dispute that defendant was the shooter. The critical evidence at trial included how Hall was acting around the time of the shooting and whether he had a gun.

*The Families*

In 2021, Hall and his family lived in an apartment in Sacramento. According to Hall's son and long-time girlfriend, he consumed alcohol on a regular basis but did not have

---

[2] The trial court also denied defendant's request to strike the section 12022.53, subdivision (d) firearm enhancement and impose a lesser enhancement instead.

[3] The trial court also sentenced defendant to an additional consecutive year in the separate case involving the prior strike.

2

a gun and never carried one. At trial, several of his neighbors testified that they were aware of his excessive drinking habits, but none of them had ever seen him with a gun.

Defendant lived in an apartment near Hall with various members of his family, including his four children, sister J.M., mother M.M., and others. Defendant had numerous (11) siblings, including his brother B.M. At the time of the shooting in November 2021, B.M. and his wife M.D. were homeless and had two young children, Isabel and infant B.

B.M. and M.D. had a history of substance abuse. At trial, they both testified under a grant of immunity. Over the course of the trial, the jury heard evidence that child endangerment charges were currently pending against B.M. and M.D. for a drug-related incident in May 2022 involving neglect of B., that there were a large number of hypodermic needles in their SUV at the time Isabel was shot in November 2021, and that B.M.'s/defendant's sister J.M. had custody of B. twice since 2021 and became his permanent guardian in January 2023.

*The Shootings*

On the evening of November 16, 2021, B.M. and his family went to defendant's apartment to ask J.M. for money. After B.M. parked his SUV, he had a brief interaction with Hall about cigarettes; Hall seemed drunk but was friendly. Then B.M. and Isabel went inside defendant's apartment, followed soon by M.D. with B.

Inside, there were various members of B.M.'s family, including defendant, who was upstairs with his children. During a discussion that did not include defendant, J.M. told B.M. that she could not give him any money until the next morning, which upset B.M. and his wife. According to (sister) J.M. and (mother) M.M., on the night of the shooting, they saw a man outside yelling that someone was going to die. M.M., who thought the man was Hall, claimed that she saw a bulge in Hall's pocket and what appeared to be the handle of a gun sticking out of his pants. According to J.M., the man outside sounded very angry and aggressive. While the two women claimed that B.M. and M.D. both said that there was a

3

man outside with a gun on the night of the shooting, B.M. and M.D. denied that they said anything about Hall.

When B.M. and his family returned to their SUV around 15 to 20 minutes later, defendant, M.M., and J.M. followed behind them. According to M.D., she wanted to leave because there was talk "about the drunk guy outside" and she did not want anything "dumb" to happen. As B.M. and the others approached his SUV, B.M. noticed that Hall was waiting for him. Hall did not have a gun or other weapon. B.M. told Hall that he would give him a cigarette and instructed Hall to come around to the driver's side door. Shortly thereafter, B.M. heard a "firecracker" sound. Meanwhile, M.D. saw defendant, who was standing at the front of the SUV, pull out a gun and fire without saying a word. The bullet struck Isabel in the face and she fell to the ground.

When B.M. asked what happened, defendant, who looked shocked, said he accidentally shot Isabel. Defendant also looked at M.D. and yelled that he had shot Isabel.

M.D. called 911 and tried to help Isabel, who was bleeding from her left temple. Meanwhile, defendant was trying to "fix" his gun, "trying to get the rounds to go into the chamber" by "cocking the gun." When Hall ran away, defendant chased after him and additional gunshots were fired. Thereafter, defendant's mother yelled at him about the gun and his sister told him to leave the area. Defendant fled the scene before the police and medical personnel arrived. Isabel died, as did Hall.

*The Forensic and Firearm Evidence*

Although the toxicology results showed that Hall had a potentially lethal blood alcohol level (0.38), alcohol did not cause his death. He died from a single gunshot wound to the back of the head. The police did not find a gun on or near Hall; he had only a cell phone and keys in his pockets.

Isabel died of a single gunshot wound that entered just below her right eye in a downward trajectory, exiting the back of her head.

4

At the scene, there were three spent nine-millimeter shell casings and one "live" (or intact) nine-millimeter bullet. There was a nine-millimeter shell casing near Isabel's body as well as a bag of drugs, which tested presumptively positive for cocaine. Hall's body was about 100 feet from Isabel's. A bullet fragment, two nine-millimeter shell casings, and a nine-millimeter bullet were found near Hall's body.

At trial, there was evidence explaining how semiautomatic handguns work, including testimony that it is "common" for such guns to "malfunction" in a way that prevents a bullet from firing when the trigger is pulled. A police officer explained that this can occur when a semiautomatic handgun is misloaded or does not load correctly after a bullet is fired, and that "racking" the slide on the gun will "clear" (or eject) a live bullet from the gun and load the next bullet from the clip into the chamber for firing.

*Postshooting Statements by B.M. and M.D.*

At the scene, both B.M. and M.D. told the police that they did not know who the shooter was. M.D. claimed a man had run past her and fired a single gunshot. She also claimed that Hall had been aggressive with B.M. when they arrived at defendant's apartment earlier that evening, and that, immediately prior to the shooting, Hall was leaning on her SUV with his hands in his pockets, swearing and yelling at B.M. However, M.D. stated that she never saw Hall holding a gun. B.M. claimed that Hall had a bulge in his pocket that he thought was a gun, and that Hall was acting angry and aggressive. He said that Hall had claimed he was going to "smoke" the person in the SUV who had been yelling at him.

After B.M. and M.D. learned that Isabel had died, M.D. told the police that defendant was the shooter. At trial, M.D. explained that she initially lied to the police to protect defendant, and that she decided to tell the truth about defendant being the shooter when she learned that Isabel had died. Upon questioning at trial, B.M. explained that he attempted to protect defendant by telling the police that he thought Hall had a gun.

5

After B.M. and M.D. left the hospital, they went to the police station. During questioning about the shooting, B.M. explained that defendant told him to get into his SUV and that he (defendant) would take care of Hall. B.M. further explained that, after the first shot was fired, he asked defendant what he was doing, and defendant screamed, "I hit [Isabel], I hit [Isabel]." Defendant also told B.M. that he was going to kill Hall, who was running away as defendant was trying to "fix" his gun. B.M. told defendant to stop, but defendant ignored him and ran down the street and shot Hall.

At trial, B.M. and M.D. explained that defendant's mother (M.M.) urged them to tell the police that Isabel had been shot by another man. During a subsequent conversation, defendant's sister (J.M.) told B.M. and M.D. about an altercation between defendant and Hall that occurred two days before the shooting. J.M. explained that defendant had pulled out a gun and threatened to kill Hall after Hall had aggressively asked J.M. for a cigarette.

Around a year and one-half after the shooting, in June 2023, B.M. told a criminal investigator from the district attorney's office that, when he arrived at defendant's apartment on the night of the shooting, he saw what appeared to be a gun in Hall's pants (a bulge) and told Hall to put the gun away. B.M. also said that when he returned to his SUV prior to the shooting, Hall claimed to no longer have a gun.

*Defendant's Arrest and Isabel's Funeral*

Following the shooting, defendant went to his cousin's house. Defendant was arrested the next morning. Later that same day, defendant wrote apology letters to B.M. and M.D.

Although defendant's cousin testified that he could not recall the substance of the conversation he had with defendant on the night of the shooting, B.M. testified that the cousin told him and M.D. at Isabel's funeral that defendant had admitted to accidentally shooting Isabel. According to M.D., the cousin also said that defendant admitted to shooting a man (Hall), claimed Isabel was shot when his gun went off as he attempted to

6

pistol whip Hall, and admitted to having "some problems" with Hall a couple of days before the shooting.

*Mother M.M.'s Phone Call and Testimony*

At some point after defendant was arrested, M.M. called B.M. and M.D. and told them that someone other than defendant shot Isabel and that someone had taken a gun from Hall's body after the shooting but before the police arrived. At trial, M.M. claimed that, on the night of the shooting, she had seen a man outside her apartment with what appeared to be a gun in his pants, and that the man said that "somebody was going to die." One of defendant's other brothers told a responding police officer that, prior to the shooting, Hall had been saying that people had to die, and that Hall had fired a gun. According to M.M., after the shooting, she saw people taking what appeared to be a gun and wallet from Hall's pockets before the police arrived.

*The Testimony of Neighbors and Residential Surveillance Video*

Several of defendant's neighbors testified that, on the evening of the shooting, they saw Hall but none of them saw him with a gun. One of the neighbors had a surveillance camera that captured the shooting, which was played for the jury.

After hearing gunshots, one of defendant's neighbors came outside before the police arrived and approached Hall to see if he was breathing. The neighbor stayed near Hall until the police arrived. She did not see anyone take anything from Hall's body or go through his pockets.

**DISCUSSION**

I

*Exclusion of Fentanyl Evidence*

Defendant first contends the trial court committed prejudicial evidentiary error by improperly excluding, pursuant to Evidence Code section 352, evidence that Isabel had fentanyl in her system at the time of her death. Defendant argues that this evidence was

7

relevant and admissible to impeach the credibility of B.M. and M.D., Isabel's parents. As we will explain, we find no evidentiary error or prejudice.

A. *Additional Background*

Prior to trial, the People moved in limine to exclude evidence (e.g., toxicology report) showing that, at the time of her death, Isabel had fentanyl in her system. The People argued the evidence should be excluded under Evidence Code section 352 because it was not relevant to the contested issues in the action and was highly prejudicial. The defense disagreed, arguing that defendant should be permitted to question Isabel's parents (B.M. and M.D.) about this issue because evidence of fentanyl in Isabel's system was relevant to their credibility, as it amounted to a crime of moral turpitude.[4] The defense urged the trial court to admit the evidence for impeachment purposes.

The trial court excluded the evidence under Evidence Code section 352. The court explained that the probative value of the evidence was limited, and that any probative value of the proffered impeachment evidence was substantially outweighed by its cumulative nature and the probability that its admission would create a substantial danger of undue prejudice, confusing the issues, and misleading the jury. The court made its ruling after "hearing how the evidence . . . played out during trial."[5] In a written order, the court explained, in part, as follows:

"There was ample opportunity given to the defense for examining [B.M.] and [M.D.] about their use of heroin before and after the death of their daughter. They were also asked about pending child endangerment charges stemming from an incident in May 2022, involving their young son, [B.], who was apparently left to wander by himself in a parking lot outside of a Walmart while [B.M.] and [M.D.] were 'asleep' in the front seat of their

---

[4] It was undisputed that Isabel was *not* given fentanyl by medical personnel after she was shot.

[5] Prior to trial, the trial court indicated that it was inclined to exclude the challenged evidence. However, the court did not make a final ruling until the close of trial.

8

Acura sports utility vehicle with evidence of heroin use surrounding them. [M.D.] was found with tin foil on her lap that had a burnt substance, which the arresting deputy sheriff testified was typical of heroin ingestion by inhalation. At least four photographs of the interior of the SUV showed dozens of hypodermic needles in the center console and other areas. The photographs were startling and damning evidence of rampant and careless hard drug use by [B.M.] and [M.D.]. This and admissions by both witnesses that they lied to law enforcement about the circumstances of their daughter's death, all contributed to serious and grave challenges to their credibility."

The trial court further stated: "Volatile evidence of Fentanyl ingestion by Isabel, if admitted, would add great uncertainty to how a reasonable juror would respond to that kind of information. Even with an instruction limiting the jury to considering such evidence for the sole purpose of determining credibility of [B.M.] and [M.D.], . . . there is no way to gauge how they would react. Defendant already had abundant impeachment evidence admitted against both witnesses, in addition to having each of them granted use immunity in the middle of trial that the jury can consider when determining their credibility. Toxicology results showing Fentanyl in Isabel's system would not add much to other evidence that was devastating to each witness' veracity. This lack of probative value, when weighed against the substantial risk of confusion of the issues in having the jury decide whether or not [B.M.] or [M.D.] or both of them somehow introduced their deceased daughter to Fentanyl or carelessly left that drug available for her, renders the blood test results and related inquiries inadmissible under Evidence Code section 352. That evidence would have sidetracked the attention of the jurors and moved them toward more ill-feelings about [B.M.] and [M.D.] as parents. There is no doubt that the poor parenting by [B.M.] and [M.D.] was established by defense counsel during cross-examination and additional evidence about how Fentanyl got into Isabel's bloodstream did not serve much of a purpose, if any. Exercising the court's discretion, the court finds that the probative value of Fentanyl in Isabel at the time of autopsy and questioning about how she had that enter her system is

9

substantially outweighed by the probability that admitting that evidence would confuse the issue; mislead the jury and be unduly prejudicial to [B.M.] and [M.D.] on the witness stand."

B. *Applicable Legal Principles*

We review Evidence Code section 352 rulings under an abuse of discretion standard. (*People v. Waidla* (2000) 22 Cal.4th 690, 724; *People v. Avila* (2006) 38 Cal.4th 491, 578.) Such rulings "will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9-10.)

Only relevant evidence is admissible. (Evid. Code, § 350.) Relevant evidence is defined as "evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (*Id.*, § 210.)

"A collateral matter has been defined as 'one that has no relevancy to prove or disprove any issue in the action.' [Citation.] A matter collateral to an issue in the action may nevertheless be relevant to the credibility of a witness who presents evidence on an issue; always relevant for impeachment purposes are the witness's capacity to observe and the existence or nonexistence of any fact testified to by the witness. [Citations.] As with all relevant evidence, however, the trial court retains discretion to admit or exclude evidence offered for impeachment." (*People v. Rodriguez*, *supra*, 20 Cal.4th at p. 9.)

Evidence Code section 352 "empowers courts to prevent criminal trials from degenerating into nitpicking wars of attrition over collateral credibility issues." (*People v. Wheeler* (1992) 4 Cal.4th 284, 296; see also *People v. Harris* (2008) 43 Cal.4th 1269, 1291.) The trial court may exclude evidence under that section if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury. (*People v. Miles* (2020) 9 Cal.5th 513, 587; see also Evid.

10

Code, § 352.)  " '[E]vidence should be excluded as unduly prejudicial when it is of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction.  In such a circumstance, the evidence is unduly prejudicial because of the substantial likelihood the jury will use it for an illegitimate purpose.' "  (*People v. Doolin* (2009) 45 Cal.4th 390, 439.)  The trial court has broad latitude to exclude impeachment evidence, including restricting cross-examination that is repetitive, prejudicial, confusing of the issues, or of marginal relevance.  (*Harris,* at pp. 1291-1292.)

Evidentiary rulings are generally subject to harmless error review under the standard articulated in *People v. Watson* (1956) 46 Cal.2d 818, which requires us to determine if a reasonable probability exists that the jury would have reached a result more favorable to the defendant absent the error.  (*People v. Partida* (2005) 37 Cal.4th 428, 439; see *People v. Jones* (2013) 57 Cal.4th 899, 957 ["because the trial court merely excluded some evidence that could have impeached a complaining witness and did not preclude defendant from presenting a defense, any error would be one of state evidentiary law only"].)

C. *Analysis*

We see no evidentiary error here.  The defense sought to introduce evidence on a collateral credibility issue, which would have required the expenditure of time on the issues of the significance of fentanyl in Isabel's system and how it got there.  These issues had no direct bearing on the critical issues at trial;[6] namely, whether defendant was acting in perfect or imperfect self-defense at the time of the shooting.[7]  Moreover, the impeachment evidence

---

[6] The parties stipulated that fentanyl was unrelated to Isabel's cause of death.

[7] "The doctrine of self-defense embraces two types: perfect and imperfect. [Citation.] Perfect self-defense requires that a defendant have an honest and reasonable belief in the need to defend himself or herself.  [Citation.]  'Imperfect self-defense is the killing of another human being under the actual but unreasonable belief that the killer was in

11

the defense sought to present was cumulative to other evidence casting doubt on B.M.'s and M.D.'s credibility, including their conflicting and inconsistent statements about the shooting. And the jury heard evidence that both parents had a substance abuse problem (heroin), testified under a grant of immunity, currently had child endangerment charges pending against them for a drug-related incident involving the neglect of B. in May 2022, and that there were numerous hypodermic needles in their SUV at the time of the shooting in November 2021. The jury also heard that both parents denied wrongdoing in connection with the May 2022 child endangerment incident, even though there was compelling evidence to the contrary. This evidence raised serious questions as to their credibility. The evidence of the presence of fentanyl in Isabel's system at the time of her death required the expenditure of time on an inflammatory issue that was not relevant to any disputed fact of consequence to the question of defendant's guilt for the charged crimes. And to the extent the toxicology results suggested that B.M. and M.D. were neglectful parents and were under the influence of drugs at the time of the shooting, such evidence would not have produced a significantly different impression of their credibility, which was already seriously compromised.

Under the circumstances presented, the trial court could have reasonably concluded that the impeachment evidence the defense sought to introduce was cumulative as to B.M.'s and M.D.'s credibility, and therefore the presentation of such evidence would require an undue consumption of time on a collateral matter. Further, the court could have reasonably concluded that the probative value of the impeachment evidence the defense sought to introduce was marginal and substantially outweighed by the probability that its admission would create a substantial danger of undue prejudice, of confusing the issues, and misleading the jury. (See Evid. Code, § 352.) Because the trial court's ruling was not an

imminent danger of death or great bodily injury.' " (*People v. Rodarte* (2014) 223 Cal.App.4th 1158, 1168.) The doctrine of self-defense also applies to the defense of another (i.e., someone other than the defendant). (See CALCRIM Nos. 505, 571.)

abuse of discretion, defendant's constitutional claim fails. (*People v. Johnson* (2022) 12 Cal.5th 544, 607; *People v. Panah* (2005) 35 Cal.4th 395, 484, fn. 32.)[8]

Moreover, it is clear that defendant was not prejudiced. (See *People v. Brown* (2003) 31 Cal.4th 518, 545 ["reliance on Evidence Code section 352 to exclude evidence of marginal impeachment value that would entail the undue consumption of time generally does not contravene a defendant's constitutional rights to confrontation and cross-examination"]; *People v. Hall* (1986) 41 Cal.3d 826, 834 ["As a general matter, the ordinary rules of evidence do not impermissibly infringe on the accused's right to present a defense"].) Here, the defense theory was that defendant acted in self-defense, which was predicated on limited evidence that Hall had a gun and acted aggressively before the shooting. But the evidence supporting the jury's rejection of the self-defense theory was compelling and strong, including the firearm and forensic evidence, which was consistent with the testimony of B.M. and M.D. about the shooting. And the jury had ample opportunity to assess their credibility, as both parents testified at length at trial and admitted to making inconsistent statements about the shooting to the police. The jury also had the opportunity to evaluate the credibility of defendant's mother and sister, who collectively testified that Hall was aggressive prior to the shooting and had what appeared to be a gun in his pants. The mother also claimed that, after the shooting, she saw people taking what appeared to be a gun and wallet from Hall's pockets before the police arrived. During closing argument, the defense urged the jury not to believe the testimony of B.M. and M.D. In doing so, defense counsel pointed out that they had lied to the police about the shooting and highlighted other evidence that called into question their credibility. Counsel also identified the evidence she believed showed defendant was acting in self-defense. On this

---

[8] In view of our conclusion, we need not and do not consider the People's contention that defendant forfeited his constitutional claim.

13

record, we cannot conclude that it is reasonably probable the jury would have reached a result more favorable to defendant had the trial court admitted the evidence at issue here.

## II

### *Romero Motion*

Next, defendant argues the trial court erred by denying his *Romero* motion to dismiss his prior strike. As we next explain, we disagree.

A. *Additional Background*

After the jury returned its verdicts, the trial court found that defendant had a prior strike conviction--a no contest plea to assault with a deadly weapon and admission of a great bodily injury enhancement (§§ 245, subd. (a)(1), 12022.7, subd. (a))--which was based on an incident where defendant struck one of his brothers (not B.M.) with a car.

Prior to sentencing, the defense filed a *Romero* motion to dismiss defendant's prior strike. Defendant argued that such relief was warranted because the "circumstances" showed he should be deemed outside the "spirit" of the three strikes law, "at least in part." In support of his position, defendant explained that he had "significant mental health concerns" (profound grief and depression) in the weeks leading up to the shooting due to the tragic death of his wife from cancer and was abusing drugs and alcohol. Defendant further explained that he had only one prior strike conviction, which occurred "after he endured significant childhood trauma from homelessness and parental substance abuse." As for the current offenses, defendant noted that he is very protective of his family and thought that he needed to "spring into action" to protect his family from Hall. In addition, defendant noted that the failure to dismiss his strike prior would make him ineligible for "youthful offender parole," despite his young age at the time he committed the strike prior (20 years old) and the current offenses (22 years old). As a result, he claimed that the earliest he would be eligible for parole would be at age 50, after he would have served at least 25 years in prison. Finally, defendant asserted that his future prospects warranted the relief he sought, noting that, prior to his wife's death, he had decided to change his life; he returned to school and

14

obtained his GED or high school diploma. Defendant also noted that, according to his family members, he has a big heart and always thinks about others.

The People opposed the motion, claiming that dismissal of defendant's prior strike would be an abuse of discretion. In arguing that defendant was not outside the spirit of the three strikes law, the People pointed to the violent circumstances of the current offenses and the prior strike, defendant's "sizable and violent criminal history in the six years after turning 18," his improper conduct while in jail in connection with the current offenses, his failure to appear in court several times with regard to the prior strike, his failure to take responsibility for the current offenses, and his poor character and future prospects. The People insisted that the interest of justice would not be served by striking the prior strike, as defendant's "numerous criminal acts . . . confirm that he contains the potential for great violence, and that he poses an unreasonable risk of danger to the public."

After hearing arguments from the parties and considering the numerous documents submitted in connection with the *Romero* motion (e.g., education records, medical records, child protective service records, letters from defendant and his family), the trial court denied defendant's request to dismiss his prior strike. The court provided a detailed explanation, that accounted for " the constitutional rights of the defendant and the interest of society and the fair prosecution of crimes properly allege[d]," and began by considering "[t]he nature and circumstances of the defendant's current offense and his prior violent convictions," noting that the present case "involve[d] a double homicide and could not have been more violent."

The trial court reflected on defendant's prior convictions sustained since he turned 18, noting that they "demonstrate violent characteristics" and included possession of a semiautomatic firearm, after he was found in a car with that firearm and a large amount of marijuana, in December 2018, and felony burglary in January 2019, after he "smashed a car window and stole contents from that vehicle." The court noted that at the time of the burglary conviction, defendant admitted to multiple burglaries.

15

While on two grants of probation, in October of 2019, defendant was "caught smashing [a] window and breaking into vehicles." In early 2021, defendant was found in possession of a gun in a car. "On March 26th, 2021, only after three days of entering a plea to the strike offense and while pending judgment and sentencing on that strike, it is alleged that Mr. Martin was in a car with his late wife who was pregnant at the time and found with OxyContin and 38 rounds of ammunition. He admitted that he possessed those items. And as the District Attorney notes, those . . . rounds were the same caliber as the firearm used to commit the homicides in the present case."

The trial judge found that the prior conviction was recent rather than remote, having occurred in October 2019, and continued:

"There is not a close factual or legal relationship between the prior strike conviction and the present case other than the fact that he had yet to go through judgment and sentence on that case when he committed the homicides.

"The prior conviction, along with the criminal conduct, do not indicate a single period of aberrant behavior.

"The defendant's background, character and prospects for rehabilitation. The defendant is a young man at age 24. He . . . [will] be 25 this month. He is the father of four children, ages ranging from two to six years old. Mr. Martin had a terrible childhood. He was one of 12 siblings and experienced homelessness, drug abuse and neglect by both parents, ultimately resulting in foster home placement as a teenager.

"He had troubled academics as shown by the education records provided by defense counsel. He's had multiple mental health diagnoses, including, but not limited to, depression, anxiety not otherwise specified, grief and posttraumatic stress disorder. The jail psychiatric services indicates he's had suicidal thoughts while in custody and after he faced the fact that he had shot and killed his seven-year-old niece, and now his four children

16

would have to be cared for and raised by others. All of this occurring within a month after losing his young wife to cancer.[9]

"[¶] . . . [¶]

"There are indications that defendant is willing to participate in rehabilitation programs as noted by his participation in group therapy in the jail.

"Unfortunately, Mr. Martin, your problem is that you, since 2018, have been afforded many opportunities while on probation to seek services that might have kept you from a life of crime. And you have failed to achieve any expectation that rehabilitation in this case would do any good.

"Would dismissing the prior conviction fall within the spirit of the law or general meaning and purpose of the three-strikes law. I find that dismissing the prior strike conviction would fall outside the spirit of the three-strikes law. The track record demonstrated by the defendant shows a reckless disregard and inability to adhere as societal norms and conditions of probation.

"Three days after having been found guilty through his plea, for running over his brother, defendant was in a car with ammunition and drugs after failing to appear in multiple cases . . . and was basically a fugitive from the law. He committed murder and involuntary manslaughter while wearing an ankle monitor and having yet to be sentenced for running over his brother.

"He has given several conflicting written statements about the circumstances arising from the murder and manslaughter crimes he committed to the point where I can give them very little weight.

"Even with his four young children and ailing wife, defendant showed no signs of turning his life around. And he was already in serious trouble on multiple grants of probation. Mr. Martin's future prospects make dismissal of a strike conviction untenable.

---

[9] Mere weeks before the shooting, in late October 2021, defendant's wife died of cancer.

17

"Would an aggregate sentence, if the strike is imposed, be unjust? No, it would not be unjust. Defendant has had many opportunities to turn his life around and amend his behavior if not for himself but at least for the sake of his children. While the . . . pending crimes . . . have caused irreparable and permanent harm.

"The motion to strike the prior strike conviction is denied. I find, based on all of the factors that I have listed, it would not be in the interest of justice to dismiss [the] prior strike conviction. And after considering the totality of the circumstances of this case and all the records provided, imposition of a sentence pursuant to the three strikes sentencing clearly falls within the meaning and purpose of the statute, and I decline to exercise my discretion to strike the prior strike conviction."

B. *Applicable Legal Principles and Standard of Review*

Subdivision (a) of section 1385 provides that a judge may, in furtherance of justice, dismiss a criminal action. In *Romero*, our Supreme Court held that a trial court may utilize this provision to strike or dismiss a prior strike conviction for purposes of sentencing under the three strikes law. (*People v. Superior Court* (*Romero*)*, supra*, 13 Cal.4th at p. 504.)

A trial court must decide whether to strike or dismiss a prior strike by considering factors that are intrinsic to the three strikes law's sentencing scheme. (*People v. Williams* (1998) 17 Cal.4th 148, 161.) These factors include: (1) the nature and circumstances of the current conviction; (2) the nature and circumstances of the prior strike conviction; and (3) the defendant's "background, character, and prospects." (*Ibid*.) If the defendant falls outside the spirit of the three strikes law, the court may, in furtherance of justice, treat the defendant "as though he had not previously been convicted of one or more serious and/or violent felonies." (*Ibid*.)

We review a trial court's denial of a *Romero* motion for abuse of discretion. (*People v. Carmony* (2004) 33 Cal.4th 367, 373 (*Carmony*).) On review, "we are guided by two fundamental precepts. First, ' "[t]he burden is on the party attacking the sentence to clearly show that the sentencing decision was irrational or arbitrary. [Citation.] In the absence of

18

such a showing, the trial court is presumed to have acted to achieve legitimate sentencing objectives, and its discretionary determination to impose a particular sentence will not be set aside on review." ' [Citation.] Second, a ' "decision will not be reversed merely because reasonable people might disagree. 'An appellate tribunal is neither authorized nor warranted in substituting its judgment for the judgment of the trial judge.' " ' [Citation.] Taken together, these precepts establish that a trial court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it." (*Carmony,* at pp. 376-377.)

"Abuse of discretion in failing to strike a prior conviction occurs in limited circumstances: where the trial court is not aware of its discretion; where the trial court considers impermissible factors; or where applying the Three Strikes law would produce an arbitrary, capricious, or patently absurd result under the specific facts of a particular case. [Citation.] A reviewing court's disagreement with the trial court's weighing of proper factors (as distinct from the trial court's reliance on improper factors in the weighing process) does not constitute an abuse of discretion." (*People v. Dryden* (2021) 60 Cal.App.5th 1007, 1029; see *Carmony, supra*, 33 Cal.4th at pp. 378-379.)

C. *Analysis*

The record reflects that the trial court considered and balanced the relevant factors and acted well within its discretion in finding that defendant was not outside the spirit of the three strikes law. On appeal, defendant insists the court abused its discretion because the relevant factors weighed in favor of granting the *Romero* motion and " 'no reasonable minds could differ.' " But although the trial court *could* have weighed the various considerations differently than it did, no abuse of discretion appears here in light of the record and strong presumption that a trial court's denial of a *Romero* motion is a proper exercise of discretion. (*Carmony*, *supra*, 33 Cal.4th at p. 378.) This is not a case in which the relevant factors described in *Williams* so "manifestly support the striking of a prior conviction [that] no reasonable minds could differ." (*Ibid.*)

19

## III

### *Clerical Errors*

We agree with the parties that the sentencing minute order incorrectly makes two references to defendant being found guilty of voluntary manslaughter.  Because defendant was found guilty of involuntary manslaughter, we will direct the trial court to correct these clerical errors.  (*People v. Mitchell* (2001) 26 Cal.4th 181, 185.)  The abstract of judgment is unchallenged on appeal.

## DISPOSITION

The judgment is affirmed.  The trial court is directed to correct its internal records to correctly reflect the counts of conviction.


/s/
Duarte, Acting P. J.

We concur:


/s/
Renner, J.


/s/
Feinberg, J.


20